ROSS v BLUE CARE NETWORK OF MICHIGAN

Docket No. 266240. Submitted May 3, 2006, at Detroit. Decided June 13,
2006, at 9:05 a.m. Leave pending, 477 Mich ___.

Desiree E. Ross, as personal representative of the estate of Douglas
G. Ross, deceased, sought in the Office of Financial and Insurance
Services (OFIS) review under the Patient's Right to Independent
Review Act (PRIRA), MCL 550.1901 *et seq.*, of Blue Care Network
of Michigan's (BCN) denial of a claim for emergency medical
coverage for the decedent's out-of-network cancer treatment. The
OFIS Commissioner assigned the case to an independent review
organization (IRO), which concluded that the decedent's care was
considered an emergency, that it was not considered experimental
or investigational, and that the denial of coverage should be
reversed. Despite this recommendation, the commissioner upheld
BCN's denial of coverage. The Wayne Circuit Court, Michael J.
Callahan, J., reversed the commissioner's decision, and BCN
appealed by leave granted.

The Court of Appeals *held*:

1. PRIRA does not require a hearing; therefore, the proper
standard of review for the circuit court to apply to the commis-
sioner's decision was to determine whether it was authorized by
law.

2. The circuit court did not err in reversing the commissioner's
decision. The commissioner's express statutory authority extends
only to determining whether the IRO's recommendations are
contrary to the terms of coverage under the benefit plan, which
indicates that the Legislature did not intend for the commission-
er's scope of review to include the IRO's medical or clinical
findings. The commissioner's substitution of her own independent
medical conclusions for those of the IRO exceeded her statutory
authority, and, as a result, her decision was not authorized by law.

3. The circuit court erred in ordering BCN to pay for treat-
ments received after November 17, 2002. The circuit court is
limited to reviewing the final decision of the commissioner by
which the person seeking review was actually aggrieved. In this
case, the commissioner's decision applied only to treatments

received on or before November 17, 2002, which rendered treatments after that date outside the scope of the circuit court's review.

Affirmed in part, reversed in part, and remanded for further proceedings.

1. INSURANCE — MEDICAL COVERAGE — PATIENT'S RIGHT TO INDEPENDENT REVIEW ACT — STANDARD OF REVIEW.

A circuit court reviews final decisions of the Commissioner of the Office of Financial and Insurance Services rendered pursuant to the Patient's Right to Independent Review Act to determine whether they are authorized by law (MCL 550.1901 *et seq.*).

2. INSURANCE — MEDICAL COVERAGE — PATIENT'S RIGHT TO INDEPENDENT REVIEW ACT.

The Commissioner of the Office of Financial and Insurance Services is authorized by the Patient's Right to Independent Review Act to determine whether the recommendations of an independent review organization are contrary to the terms of coverage under the benefit plan, but may not reach independent conclusions regarding the independent review organization's medical or clinical findings (MCL 550.1911[15]).

*Wachler & Associates, P.C.* (by *Andrew B. Wachler* and *Adrienne Dresevic*), for Desiree E. Ross.

*Colleen C. Cohan* for Blue Care Network of Michigan.

Before: SCHUETTE, P.J., and BANDSTRA and COOPER, JJ.

PER CURIAM. Respondent appeals by leave granted the trial court's order that reversed in part the Office of Financial and Insurance Service (OFIS) Commissioner's decision to deny petitioner's claim for emergency medical coverage. We affirm in part and reverse in part and remand.

I. FACTS

In this medical insurance case, we review the OFIS Commissioner's determination that respondent prop-

erly denied most of the benefits sought because petitioner's late husband Douglas Ross's initial treatment was not "emergency care" and because Ross's follow-up care was not medically necessary to stabilize his condition.

Douglas Ross, who was insured by Blue Care Network of Michigan (BCN), a health maintenance organization, began complaining in February 2002 of back pain, for which he received pain medication and a referral to physical therapy. By April 2002, Ross could not walk or stand from the intense pain. Doctors then determined that he had multiple myeloma, a spine tumor, fractured lumbar vertebrae, and spinal stenosis. He began chemotherapy. He also underwent decompression laminectomy surgery to relieve the pressure on his spine.

In late May 2002, Ross was seen at the University of Michigan to be considered for a bone marrow transplant; it was determined that he would be reevaluated after his fourth round of chemotherapy. Although Ross continued chemotherapy, by June 24, 2002, he had developed additional nodules and lesions in the left shoulder, right side, and right eye and had gained 22 pounds in two weeks. Doctors determined that he had a very aggressive and virulent strain of multiple myeloma that was resistant to the type of chemotherapy he had been receiving.

According to petitioner Desiree Ross, Dr. Ronald Lutsic, Ross's radiological oncologist, indicated on June 25, 2002, that Ross was no longer a candidate for a bone marrow transplant given that the myeloma had spread to his soft tissues. Dr. Lutsic allegedly said that he had never before seen myeloma as aggressive. He advised radiation to ease the pain. According to petitioner, Lutsic indicated that he would pursue treatment in

Arkansas if he were Ross. No other change in Ross's primary treatment plan was recommended.

Given Lutsic's failure to prescribe anything other than radiation, on June 26, 2002, petitioner contacted Matt Rhodes, RN, at the University of Arkansas, who advised that Ross likely had extra medullary multiple myeloma, a rare type. Rhodes stated that the condition was treatable, but time was of the essence. That day, petitioner asked Dr. William Silverstone, Ross's primary care physician, for a referral to the Myeloma Institute for Research and Therapy at the University of Arkansas for Medical Sciences (UAMS), an out-of-network provider.[1] UAMS treats more cases of multiple myeloma than any other treatment center in the world. BCN advised Silverstone that the referral would take ten to 14 days because BCN needed to review the proposed treatment plan. Rhodes then indicated to BCN that Ross would need to be examined before UAMS could provide a proposed treatment plan.

On July 2, 2002, Ross began to be evaluated at UAMS. On July 8, 2002, Dr. Frits VanRhee admitted Ross to the UAMS hospital, noting that Ross had "very aggressive" multiple myeloma that required intensive therapy. Dr. VanRhee indicated that at that time, Ross was in "terrible shape" and was one week away from death. While Ross was hospitalized, he developed a staph infection, which was treated. He also received a different type of chemotherapy, called "DT-PACE," which resolved some of the nodules and lesions, the swelling in his right eye, and the fluid retention in his legs. He was discharged on July 23, 2002. He was

---

[1] Although this case involves services provided by more than one provider, for ease of reference, we refer to UAMS as encompassing all the providers in Arkansas.

readmitted on August 1-2, 2002, but the treatment he received during that admission is unclear.

On August 16, 2002, Dr. VanRhee wrote that Ross "clearly will need further therapy." Dr. VanRhee admitted Ross to the hospital again and started another round of DT-PACE chemotherapy because the myeloma was recurring. The plan was to have Ross receive a bone marrow transplant from his brother. One of Ross's treating physicians in Michigan, Stephen Goldfarb, an oncologist, concurred on August 30, 2002, that Ross had a very poor prognosis and that the only treatment of any known value was a bone marrow transplant.

On September 24, 2002, Dr. VanRhee noted that Ross's myeloma was in remission and he was scheduled for a bone marrow transplant. Dr. VanRhee also observed that "this patient essentially had been given up on at the University of Michigan . . . ." He added, in the university's defense, "most physicians and oncologists never see such aggressive myeloma and have little experience in dealing with this highly aggressive explosive form of tissue-based myelomatous disease." Dr. VanRhee noted that Ross required extremely specialized care in a center totally dedicated to myeloma—only one or two of which exist in the United States. Dr. Goldfarb agreed that Ross's best treatment would be the tandem bone marrow transplant from UAMS given the very aggressive nature of his myeloma. Ross received a bone marrow transplant at UAMS; however, he died on April 6, 2003.

BCN denied coverage for the treatments Ross received at UAMS between June 30, 2002, and November 17, 2002. Ross, however, also was hospitalized from December 23, 2002, through March 3, 2003. For an unknown reason, BCN apparently has bifurcated the treatment Ross received and has only addressed his

treatment up until November 17, 2002. Although BCN paid UAMS for some of the services rendered, apparently BCN has received reimbursement from UAMS for those payments.

In December 2002, petitioner filed a "step one member grievance" to challenge BCN's failure to cover the services from UAMS. In January 2003, the BCN associate medical director issued a decision that Ross was required to use in-network resources and denied his request for reimbursement. Petitioner then filed a "step two member grievance," which was denied because Ross had "self-referred" to UAMS despite the fact that his primary care physician allegedly had referred him to the University of Michigan.[2]

In April 2003, petitioner requested an external review by the Commissioner of the Office of Financial and Insurance Services (Commissioner) under the Patient's Right to Independent Review Act (PRIRA), MCL 550.1901 *et seq*. Pursuant to MCL 550.1917, the Commissioner assigned the case to an independent review organization (IRO), Permedion, which arranged for Ross's records to be reviewed by a practicing physician who was board-certified in internal medicine, medical oncology, and hematology.

The IRO submitted the initial review on May 16, 2003. The IRO determined that Ross's care was emergency treatment, as both Ross and Dr. VanRhee opined that time was of the essence where Ross had not responded to chemotherapy. The IRO rejected BCN's position that Ross's treatment was experimental, stating that "this reviewer feels that all the drugs used in the patient's treatment were accepted/approved chemo-

---

[2] Note that BCN spoke with Dr. Silverstone regarding a referral to UAMS on June 26, 2002. Thus, Dr. Silverstone at least attempted to refer Ross to UAMS.

therapy drugs . . . ." Further, the IRO indicated that the bone marrow transplant should not be considered experimental given Ross's history of resistant or refractory disease. Also, the IRO noted that Ross's health clearly would have declined had he waited for the long BCN approval process. The IRO concluded:

> After reviewing all the materials provided in this case, it is our reviewer's opinion that the evaluation of Mr. Ross at Arkansas Medical Center was considered an emergency and the treatment provided to this patient is not considered experimental/investigational.

In August 2003 and again in November 2004, the Commissioner asked the IRO for additional review.[3] The IRO was to specify whether each of four episodes of treatment met the criteria for emergency care under BCN's policy and at what point Ross would have been stabilized to make it medically feasible to transfer his care to an in-network facility. The four episodes included: (1) June 30, 2002, outpatient consultation; (2) July 8 to July 23, 2002, inpatient admission; (3) August 1 to August 2, 2002, inpatient admission; (4) September 9 to November 17, 2002, follow-up testing.[4] In August 2003 and November 2004, the IRO issued recommendations, noting that Ross was prudent in seeking evaluation at UAMS on June 30, 2002, especially given his severe and life-threatening complications that required admission on July 8, 2002. The IRO did not offer an opinion regarding the August 1, 2002, admission given the lack of medical records for that admission. With

---

[3] Petitioner contends that PRIRA does not provide authorization for such re-review.

[4] We note that during this time frame, Ross received bone marrow transplants from September 23, 2002, through October 9, 2002, which suggests that BCN erred in characterizing this period as only follow-up testing.

regard to the transferring of Ross's care to another facility, the IRO opined:

> The follow-up testing was to evaluate the health of the patient and effectiveness of the treatment given to this patient. This reviewer does not have specifics as to the care provided, but it would be inappropriate to "transfer" this responsibility to another facility, which was not involved with this patient's course of treatment. It is the opinion of this reviewer that it is inappropriate to unbundle the care provided to this patient for his refractory myeloma and that it is appropriate to look at the global care provided for this illness. Given the sense of emergency and life-threatening nature of the patient's condition without effective therapy, the care provided at [UAMS] was appropriate treatment.

Accordingly, the IRO again recommended that the BCN denial be reversed.

Another "re-review" was requested, so the IRO issued its fourth recommendation in March 2005. The IRO noted that, when Ross left Michigan for Arkansas in June 2002, Ross was "one week away from death," which supported the finding that Ross's situation was urgent. With regard to stabilizing Ross so that he could be transferred, the IRO indicated that Ross could not have been transferred before his discharge date any earlier than September 9, 2002. Further, the IRO rejected the claim that Ross's treatment, specifically DT-PACE chemotherapy, was experimental because "current peer-reviewed medical literature substantiates the efficacy of DT-PACE therapy and a recognized oncology organization generally accepts the treatment. Additionally, the stem-cell transplant procedure has been shown to be a significant benefit, especially in patients with poor prognostic factors. Tandem or double stem-cell transplants are considered more effective." Again, the IRO recommended that the BCN denial be overturned.

In her March 2005 opinion regarding the IRO's determinations, Commissioner Linda Watters questioned whether Ross's condition in late June 2002 fell within the definition of an emergency. The Commissioner stated:

> If [Ross's] condition was emergent at the time he left Michigan to travel to Arkansas in late June 2002 (as suggested by the IRO expert), he should have sought immediate treatment at the closest hospital. However, there is nothing in the record that clearly states what [Ross's] condition was when he left Michigan.

The Commissioner acknowledged that petitioner had sought treatment for Ross at UAMS because of its expertise in the treatment of myeloma. The Commissioner noted, however, that "an argument could be made for nearly every medical condition or disease that there are highly regarded physicians and/or medical facilities in the country that possess the highest level of expertise."

The Commissioner noted that petitioner did not utilize the expedited external review process that allowed for a coverage determination to be made within 72 hours.[5] Instead, Ross "elected to seek evaluation and treatment with an out-of-network facility without the appropriate authorization." The Commissioner found:

> • Out-of-network services are not a covered benefit for BCN members unless they are emergency services, or the appropriate referral was obtained through their primary care physician and the referral was approved by BCN.

---

[5] Petitioner indicated that she was not aware that BCN had an expedited process. We further note that PRIRA requires the health carrier to advise the covered person of the expedited external review process, MCL 550.1907(3)(a)(i). See also MCL 550.1913. It is unclear when or if BCN advised petitioner of the expedited process.

• BCN never approved or authorized the out-of-network services at issue in the Petitioner's case.

• There is no evidence that treatment was not available within the BCN network. The Petitioner's PCP [primary care physician] had apparently recommended the University of Michigan Medical Center, a tertiary medical center with a multidisciplinary cancer treatment center.

• The Petitioner's evaluation at the Institute does not constitute emergency care under the BCN Certificate or Michigan law.

• Based on the findings of the IRO physician, the Petitioner's hospitalization from July 8, 2002 through July 23, 2002 does constitute emergency care under the BCN Certificate and Michigan law and BCN authorization is not required for coverage.

• Except for the services provided from July 8, 2002 through July 23, 2002, all treatments, testing and other services provided by the Institute and UAMS Hospital are not covered benefits under the BCN Certificate.

Petitioner appealed to the circuit court, pursuant to MCL 550.1915(1), seeking reversal of the Commissioner's decision.

At the August 26, 2005, hearing regarding petitioner's appeal, Judge Michael Callahan opined that the Commissioner, by ruling that only part of Ross's treatment was an emergency, was "splitting the baby." The court reversed the Commissioner's findings:

> I'm ruling the commissioner is reversed, an emergency is an emergency and in my courtroom it will always be an emergency. The entire treatment in Arkansas was on an emergency basis. I don't know why the commissioner did what she did, but I find it contravenes substantial material evidence and I'm not going to split the kind of hairs they're willing to do. She might have had a better shot if she said none of it was an emergency, but once she said it was an emergency I find she violated her duty. It was all an emergency. You can present an order. Her judgment is reversed.

BCN then objected to the proposed order submitted by petitioner, in part because it addressed Ross's treatment during his "entire stay" in Arkansas, not just his treatment from July through November 2002. On October 7, 2005, Judge Callahan held a hearing and decided to enter the proposed order over BCN's objections. The order provides, in pertinent part:

> IT IS HEREBY ORDERED that the Insurance Commissioner's Final Agency Decision which upheld Blue Care Network's denial of coverage for services rendered to Douglas G. Ross by out-of-network Arkansas providers is reversed on the basis that all services provided to Douglas G. Ross by out-of-network Arkansas providers were emergency services and the Insurance Commissioner's Final Agency Decision was unauthorized by law. It is hereby ordered that all services provided to Douglas G. Ross by out-of-network Arkansas providers during his entire stay in Arkansas constitute emergency services and BCN shall approve coverage for said services.

On November 21, 2005, the circuit court denied BCN's motion for stay. On December 15, 2005, this Court granted leave to appeal.

## II. PROPER STANDARD FOR REVIEWING A FINAL DECISION OF THE OFIS COMMISSIONER

### A. STANDARD OF REVIEW

The proper standard of review to be applied by the circuit court in reviewing an administrative agency's final decision is a question of law, which this Court reviews de novo. *Palo Group Foster Care, Inc v Dep't of Social Services*, 228 Mich App 140, 145; 577 NW2d 200 (1998).

### B. ANALYSIS

When reviewing a final decision of the OFIS Commissioner, the circuit court is to determine whether the

decision was authorized by law. Whether the circuit court correctly applied this standard will be addressed in part III of this opinion. Const 1963, art 6, § 28 provides, in relevant part:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. *This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.* [Emphasis added.]

"Whether 'a hearing is required' is determined by reference to the statute governing the particular agency." *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488; 586 NW2d 563 (1998). " 'Where no hearing is required, it is not proper for the circuit court or this Court to review the evidentiary support of an administrative agency's determination.' " *Id.*, quoting *Brandon School Dist v Michigan Ed Special Services Ass'n*, 191 Mich App 257, 263; 477 NW2d 138 (1991). Where a hearing is not required, an administrative decision "is reviewed only under the minimum standard." *J & P Market, Inc v Liquor Control Comm*, 199 Mich App 646, 650; 502 NW2d 374 (1993). In other words, if no hearing is required, the circuit court's review is limited " 'to a determination whether the action of the agency was authorized by law.' " *Northwestern Nat'l Cas, supra* at 488, quoting *Brandon, supra* at 263.

No hearing is provided by PRIRA. See MCL 550.1901 *et seq*. Instead, in cases involving questions of medical necessity, a qualified IRO reviews the medical evidence

without holding a hearing. MCL 550.1911(6); MCL 550.1911(11); MCL 550.1911(13). Although an appeal to the circuit court is provided by PRIRA, the act sets forth no specific judicial standard of review. MCL 550.1915. Therefore, on appeal to the circuit court, a final decision of the OFIS Commissioner under PRIRA is reviewed pursuant to the "authorized by law" standard articulated in Const 1963, art 6, § 28. *English v Blue Cross Blue Shield of Michigan*, 263 Mich App 449, 455; 688 NW2d 523 (2004).

The decision of the OFIS Commissioner in this case was rendered pursuant to PRIRA, which does not require a hearing. Therefore, the circuit court was not permitted to reweigh the factual evidence presented to the OFIS Commissioner, *Northwestern Nat'l Cas, supra* at 488, but was required only to determine whether the Commissioner's decision was "authorized by law," *English, supra* at 455.

### III. OFIS COMMISSIONER'S DECISION

Respondent next argues that the OFIS Commissioner's decision to deny coverage was authorized by law and that the circuit court was thus required to affirm it. We disagree.

### A. STANDARD OF REVIEW

When reviewing a circuit court's review of an administrative decision for which a hearing is required, this Court reviews the circuit court's ruling for clear error. See *Boyd v Civil Service Comm*, 220 Mich App 226, 234; 559 NW2d 342 (1996). However, when reviewing a circuit court's review of an administrative decision *for which no hearing is provided*, this Court reviews the administrative decision in the same manner as the

circuit court. *English, supra* at 455. Thus, this Court reviews a final decision of the OFIS Commissioner under PRIRA to determine whether it was "authorized by law." *Id.*

This case also involves questions of statutory interpretation. Questions of statutory interpretation are reviewed de novo on appeal. *Eggleston v Bio-Medical Applications of Detroit, Inc,* 468 Mich 29, 32; 658 NW2d 139 (2003).

### B. ANALYSIS

By discounting the IRO's medical recommendations and replacing them with her own independent conclusions, the OFIS Commissioner failed to comply with the requirements of PRIRA and exceeded her authority. The OFIS Commissioner's decision was therefore unauthorized by law. We affirm the circuit court's reversal of the OFIS Commissioner's decision to deny coverage.

Permedion, the IRO selected in this case, issued its first recommendation on May 16, 2003. In that recommendation, the IRO determined that Ross's initial evaluation from June 30, 2002, until July 7, 2002, had constituted emergency care, and that the subsequent hospitalization of July 8 to 23, 2002, had constituted emergency care as well. The IRO physician opined that it would not have been medically feasible to transfer Ross away from the Arkansas facilities while he was receiving this treatment, even after his July 23 discharge from hospitalization. The IRO's reconfirmed these recommendations on three subsequent occasions, each time advising the OFIS Commissioner that the initial evaluation and hospitalization had constituted emergency care, and each time opining that all the services provided through November 17, 2002, were medically necessary to stabilize Ross before he could be

transferred to an in-network facility. Nonetheless, upon review of the IRO's four separate recommendations, the OFIS Commissioner determined that only the hospitalization of July 8-23, 2002, had constituted emergency care, and that Ross had been sufficiently stabilized as of July 23 for transfer to an in-network facility.

Respondent argues that the OFIS Commissioner is free to disregard an IRO's recommendation regarding medical issues, and that the Commissioner may reach her own medical conclusions when conducting an independent review under PRIRA. In support of this proposition, respondent relies on *English, supra*, where this Court stated that the IRO's recommendation "is not binding" on the OFIS Commissioner. *English, supra* at 464. Moreover, respondent contends that under the plain language of PRIRA, the IRO's medical recommendations are not entitled to any degree of deference by the Commissioner.

Petitioner concedes that the OFIS Commissioner is required to review the IRO's recommendation "to ensure that it is not contrary to the terms of coverage under the covered person's health benefit plan." MCL 550.1911(15). However, petitioner contends that this language limits the Commissioner's review of the IRO recommendation *only* to whether the recommendation comports with the contractual language of the health plan. Petitioner therefore asserts that the statutory language precludes the Commissioner from substituting her own medical judgment for the IRO's recommendations on *medical or clinical issues.*

The Michigan appellate courts have addressed PRIRA only once since its enactment in 2000. In *English, supra,* the issue was not whether the medical services provided constituted emergency care, but rather whether the services had been medically necessary. There, the petitioner

underwent several blood tests. *English, supra* at 451. The petitioner's insurance provider denied coverage for some of the tests, noting that it did not cover the expense of tests for "routine/screening procedures." *Id.* at 452. The petitioner filed a request for review pursuant to PRIRA, and the OFIS Commissioner assigned the petitioner's case to an IRO. *Id.* The IRO determined that some, but not all, of the tests had been medically necessary. *Id.* at 453. The OFIS Commissioner fully agreed with the IRO's recommendation, ordering the insurance provider to pay for the specific tests found to be medically necessary. *Id.* The circuit court affirmed the OFIS Commissioner's order, and this Court granted leave to appeal. *Id.* at 454.

On appeal, in addition to arguing that the tests had not been medically necessary, the respondent asserted that its due process rights had been violated because it had not been informed of the identity of the IRO. *English, supra* at 463. This Court rejected the respondent's due process challenge, noting that there are substantial safeguards built into PRIRA to ensure that only qualified IROs are chosen in any given case. *Id.* at 464-465. This Court commented that a party has no right to discover the identity of the individual IRO itself, because it is the OFIS Commissioner—and not the IRO—who actually issues the final decision under PRIRA:

> The [IRO's] recommendation merely assists the commissioner in reaching a decision and serves as a tool to alleviate the administrative burden [PRIRA] places on the commissioner. Moreover, the recommendation is not binding on the commissioner. In fact, on receipt of the recommendation, the commissioner must independently review the recommendation to confirm that it does not contradict the terms of the health plan. MCL 550.1911(15). [*English, supra* at 464.]

Respondent in the present case relies on this language for the proposition that the OFIS Commissioner is never bound to follow the recommendations of the IRO, even on medical or clinical issues. We disagree. As an initial matter, a panel of this Court "must follow the *rule of law* established by a prior published decision of the Court of Appeals issued on or after November 1, 1990 . . . ." MCR 7.215(J)(1) (emphasis added). However, it is well settled that "statements concerning a principle of law not essential to determination of the case are obiter dictum [sic] and lack the force of an adjudication." *Roberts v Auto-Owners Ins Co,* 422 Mich 594, 597-598; 374 NW2d 905 (1985). " ' "[A]ny statements and comments in an opinion concerning some . . . debated legal proposition not necessarily involved nor essential to determination of the case in hand are, however illuminating, but obiter dicta" and lack the force of a binding adjudication.' " *Foreman v Foreman,* 266 Mich App 132, 139; 701 NW2d 167 (2005), quoting *McNally v Wayne Co Canvassers,* 316 Mich 551, 558; 25 NW2d 613 (1947), quoting *People v Case,* 220 Mich 379, 382-383; 190 NW2d 289 (1922).

The *English* panel's statement that "the [IRO's] recommendation is not binding on the commissioner" is not a "rule of law." Rather, it is merely a statement "concerning some . . . legal proposition not necessarily involved nor essential to determination of the case in hand." *Foreman, supra* at 139. The *English* panel was never actually presented with the question whether an IRO's recommendation is binding on the OFIS Commissioner. This is evident from the fact that the Commissioner *fully agreed* with the IRO's recommendation in that case. *English, supra* at 453. Rather, the statement that "the [IRO's] recommendation is not binding on the commissioner" was merely made to support the panel's observation that a party has no due-process right to

discover the individual IRO's identity in a given case. *Id.* at 464. However, this remark was also supported by the language of PRIRA itself, which provides safeguards for both parties in a PRIRA review. Here the language at issue was not essential to the resolution of a question that was actually presented to the Court; thus, it "lack[s] the force of an adjudication." *Roberts, supra* at 597-598. Therefore, the *English* panel's wording concerning the absence of deference owed to an IRO recommendation does not constitute a "rule of law" within the meaning of MCR 7.215(J)(1), and this Court is not bound by that language.

Moreover, even if the language of *English, supra,* were precedentially binding as a "rule of law," the language at issue is internally self-limiting. As the *English* panel recognized, the OFIS Commissioner's independent review of the IRO recommendation under MCL 550.1911(15) is *"to confirm that it does not contradict the terms of the health plan." English, supra* at 464 (emphasis added). Therefore, even if the OFIS Commissioner is entitled to disregard the IRO's recommendations when those recommendations conflict with the plain language of the health plan or insurance contract, *English* does not necessarily support the proposition that the OFIS Commissioner may disregard the IRO's recommendations on purely medical or clinical issues. Surely, the determinations whether Ross's condition constituted an emergency, and whether his condition was sufficiently stable to warrant transfer to another facility, were purely medical questions that fell outside the scope of the OFIS Commissioner's independent review of the IRO recommendation. The relevant language from *English* does not foreclose petitioner's theory that the OFIS Commissioner owed deference to the IRO on the medical issues in this case.

In order to determine the proper degree of deference owed to an IRO's medical recommendations, it is necessary to examine the text of PRIRA itself. The relevant language of PRIRA provides:

> Upon receipt of the assigned independent review organization's recommendation under subsection (14), the commissioner immediately shall review the recommendation to ensure that it is not contrary to the terms of coverage under the covered person's health benefit plan with the health carrier. [MCL 550.1911(15).]

The primary goal of statutory interpretation is "to discern and give effect to the intent of the Legislature." *Shinholster v Annapolis Hosp*, 471 Mich 540, 548-549; 685 NW2d 275 (2004). In discerning legislative intent, this Court gives effect to every word, phrase, and clause in the statute. *Id.* at 549. If reasonable minds could differ regarding the meaning of a statute, judicial construction is appropriate. *Adrian School Dist v Michigan Pub School Employees' Retirement Sys*, 458 Mich 326, 332; 582 NW2d 767 (1998).

Here, reasonable minds could differ regarding the meaning of MCL 550.1911(15). MCL 550.1911(15) could mean either: (1) that the OFIS Commissioner's review of the IRO's recommendation is *limited to* "ensur[ing] that it is not contrary to the terms of coverage under the covered person's health benefit plan," or (2) that the OFIS Commissioner's review of the IRO's recommendation *must include, among other things*, a determination whether it is "contrary to the terms of coverage under the covered person's health benefit plan." Because reasonable minds could disagree with respect to these two possible meanings of MCL 550.1911(15), judicial interpretation of the statute is appropriate. See *Adrian School Dist, supra* at 332.

Michigan courts recognize the maxim *"expressio un- ius est exclusio alterius,"* which means that the express mention in a statute of one thing implies the exclusion of other similar things. *Bradley v Saranac Community Schools Bd of Ed,* 455 Mich 285, 298; 565 NW2d 650 (1997); *King v Ford Motor Credit Co,* 257 Mich App 303, 311; 668 NW2d 357 (2003). "[L]ike all rules of construc- tion, the doctrine cannot be applied if it defeats the Legislature's intent; it is simply a means to determine that intent." *Houghton Lake Area Tourism & Conven- tion Bureau v Wood,* 255 Mich App 127, 151; 662 NW2d 758 (2003).

In enacting PRIRA, the Legislature expressly pro- vided that the OFIS Commissioner's review of an IRO's recommendation must "ensure that it is not contrary to the terms of coverage under the covered person's health benefit plan." MCL 550.1911(15). However, this is the only specific requirement provided by the Legislature with respect to the OFIS Commissioner's review. The Legislature did not include any other responsibilities to be performed by the OFIS Commissioner when review- ing an IRO's recommendation. Therefore, under the doctrine *expressio unius est exclusio alterius,* the Legis- lature must have intended to *limit* the OFIS Commis- sioner's review of an IRO's recommendation to "ensur- [ing] that it is not contrary to the terms of coverage under the covered person's health benefit plan." Ac- cordingly, while the Legislature intended that the OFIS Commissioner would review the IRO's recommendation for consistency and compliance with the health plan itself, the Legislature did not intend that the OFIS Commissioner would review or reevaluate the IRO reviewer's specific medical or clinical findings. Instead, the language of PRIRA indicates that the Legislature intended the OFIS Commissioner to defer to the IRO's

recommendation on medical issues that do not implicate the language of the health plan itself.

The BCN schedule of benefits provides that respondent will provide treatment for "medical emergenc[ies]" (BCN Schedule of Benefits, § 1.05, pp 2-3). The schedule of benefits also provides coverage for related medically necessary services and related ancillary services (BCN Schedule of Benefits, § 1.05, pp 2-3). The IRO specifically concluded that Ross's initial evaluation from June 30, 2002, until July 7, 2002, and his hospitalization of July 8 to 23, 2002, both constituted emergency services.

Further, as recognized by the OFIS Commissioner in her final opinion and order, Michigan law requires a health maintenance organization certificate, which otherwise provides coverage for emergency health services, to

> provide coverage for medically necessary services provided to an insured for the sudden onset of a medical condition that manifests itself by signs and symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in serious jeopardy to the individual's health[,] . . . serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. An insurer shall not require a physician to transfer a patient before the physician determines that the patient has reached the point of stabilization. An insurer shall not deny payment for emergency health services up to the point of stabilization provided to an insured under this subsection because of either of the following:
>
> (a) The final diagnosis.
>
> (b) Prior authorization was not given by the insurer before emergency health services were provided. [MCL 500.3406k(1).]

MCL 500.3406k(1) goes on to define "stabilization" as "the point at which no material deterioration of a

condition is likely, within reasonable medical probability, to result from or occur during transfer of the patient."[6] The IRO reviewer in this case specifically concluded that it would not have been medically feasible to transfer Ross at any time before November 17, 2002, because his condition had not been sufficiently stabilized and because his follow-up treatments at the Arkansas facilities were medically necessary.

Contrary to respondent's argument in the present case, the OFIS Commissioner was not legislatively authorized to replace the IRO's medical determinations on these two issues with her own determinations regarding the emergency nature of Ross's care and whether Ross's condition had been medically stabilized. Although the OFIS Commissioner was required to review the IRO's recommendation for consistency with the health plan's language, she was not authorized to reach independent conclusions on the pertinent medical issues in this case.

We review the OFIS Commissioner's decision to determine whether it was "authorized by law." *English, supra* at 455. An administrative decision is unauthorized by law if it is: (1) in violation of a statute or the Constitution, (2) in excess of the statutory authority or jurisdiction of the agency, (3) made upon unlawful procedures resulting in material prejudice, or (4) arbitrary and capricious. *Id.* To the extent that the OFIS Commissioner replaced the IRO's medical determinations with her own independent conclusions, she exceeded her statutory authority and

[6] We reject BCN's reliance on language from its schedule of benefits, which it claims requires that, to maintain coverage, care for a patient must be transferred from an out-of network provider to an in-network provider even when not "medically feasible," unless the patient remains hospitalized. Such a provision would run afoul of the statutory requirement.

jurisdiction as defined by PRIRA. Thus, the Commissioner's actions were unauthorized by law. See *id.*

## IV. ADDITIONAL CLAIMS

Respondent argues that the circuit court erred by ordering respondent to pay for *all* of Ross's treatment at the Arkansas facilities. We agree.

### A. STANDARD OF REVIEW

The circuit court's appellate jurisdiction in the case of PRIRA appeals is governed by statute. Whether PRIRA allows the circuit court to consider matters not actually decided by the OFIS Commissioner is a matter of statutory interpretation. Statutory interpretation is a question of law, which is reviewed de novo on appeal. *Eggleston, supra* at 32.

### B. ANALYSIS

The circuit court was not authorized under PRIRA to consider the medical treatment received by Ross between November 17, 2002, and March 3, 2003. We remand this case, and direct the circuit court to limit its final order to medical treatment provided through November 17, 2002.

PRIRA provides, in relevant part, that "[a] person aggrieved by an external review decision . . . may seek judicial review . . . in the circuit court." MCL 550.1915(1). The plain meaning of this section is that the aggrieved person is entitled to seek judicial review *of the aggrieving decision.* In other words, a circuit court is limited under MCL 550.1915(1) to reviewing the final decision of the OFIS Commissioner by which the person seeking review was actually aggrieved.

In this case, the OFIS Commissioner issued a final decision denying medical coverage for all treatment (with the exception of the July 8 to 23, 2002, hospitalization) Ross received between June 30, 2002, and November 17, 2002. However, the OFIS Commissioner's decision did not address any treatment Ross received after November 17, 2002. Therefore, there was no decision regarding the post-November 17 treatment by which petitioner could have been aggrieved. Under the clear wording of MCL 550.1915(1), a petitioner may only seek judicial review of an actual adverse decision. Thus, petitioner was not entitled to seek circuit court review of Ross's treatment during this post-November 17 period. The circuit court was not authorized to review matters outside the scope of the OFIS Commissioner's actual adverse decision. MCL 550.1915(1).[7]

We affirm in part the circuit court's decision, but remand for a modification of the court's order. On remand, the circuit court should modify its order to encompass only the medical services provided between June 30, 2002, and November 17, 2002. We do not retain jurisdiction.

---

[7] In the event that the Commissioner issues an adverse determination concerning the post-November 17 services in the future, petitioner will be permitted under MCL 550.1915(1) to seek judicial review of that decision.