KELLY, J.
(dissenting). The majority correctly frames the issue. It is “whether the Commissioner of the Office of Financial and Insurance Services (OFIS) is bound by the recommendations of an independent review organization (IRO) on issues of medical necessity and clinical review.”[1] But the majority errs by deciding that the commissioner is never bound by such recommendations.
I conclude that the commissioner’s review is limited to ensuring that an IRO’s recommendations are not *178 contrary to the terms of coverage under the covered person’s health-benefit plan.[2] In this case, the IRO’s recommendation that respondent Blue Care Network of Michigan be required to pay for services provided before November 17, 2002, was consistent with the terms of coverage. Therefore, I would affirm the well-reasoned decision of the Court of Appeals.
FACTS
Respondent insured petitioner’s decedent, Douglas Ross. In February 2002, Ross began experiencing back and leg pain. By April, he could no longer walk or stand. He was diagnosed as suffering from numerous conditions, the most serious being a severe form of multiple myeloma.[3]
Ross underwent a variety of treatments, including chemotherapy, to combat the disease. In May 2002, he was advised to seek treatment from the Bone Marrow Transplant Clinic at the University of Michigan (U of M). Unfortunately, he was unable to begin treatment at the U of M immediately because his blood-sugar level was elevated.
By early June, Ross’s multiple myeloma had become increasingly severe and resulted in tumors in his leg, neck, and eye. Ross was advised by his treating physicians that he had an extremely aggressive strain of the disease. Dr. Lutsic, his radiation oncologist, characterized his condition as the most severe form of the disease he had ever seen. As a result of his deterioration, Ross was told that he was no longer a candidate for a *179 bone-marrow transplant and that the U of M would no longer treat him. He was advised that the only remaining course of treatment was medication to handle the pain as he died.
In a final effort to prolong Ross’s life, petitioner contacted the University of Arkansas for Medical Sciences (UAMS), a leader in the treatment of myeloma. Dr. Lutsic had told petitioner that he would pursue this option if he were in the same position as Ross. UAMS advised petitioner that it had successfully treated the condition Ross had, but, if he were to have any chance of survival, he would have to start treatment promptly. Ross immediately requested a referral to UAMS, which was not an in-network provider. Respondent told Ross that it needed time to review UAMS’s treatment plan before it took action. However, UAMS stated that it could not provide a treatment plan without first evaluating Ross.
On June 30, 2002, Ross traveled to UAMS for an evaluation. The doctors at UAMS found Ross to be close to death and decided that, without aggressive treatment, he would die very soon. On July 9, 2002, Dr. van Rhee of UAMS provided respondent with an explanation of Ross’s condition and the proposed treatment. Dr. van Rhee informed respondent that, without treatment, Ross had only days to live. Ross’s certificate of coverage included medically necessary services without prior authorization in cases of immediate and unforeseen medical emergency. This coverage was available until it became medically feasible to transfer the covered person to an in-network provider. Nonetheless, respondent informed UAMS that it intended to deny coverage. And, ultimately, it did refuse to pay for any services provided by UAMS.
The treatment administered at UAMS immediately showed marked success. On July 23, 2002, Ross was *180 discharged. Ross continued outpatient treatment with UAMS, and he was also readmitted on numerous occasions. On December 23, 2002, Ross was admitted to UAMS for the last time. He remained an inpatient until March 2003. He died on April 6,2003, at 46 years of age.
In regard to Ross’s insurance claims, respondent categorized UAMS’s services into four periods: (1) outpatient facility services commencing on June 30, 2002, (2) inpatient admission from July 8 through July 23, 2002, (3) inpatient admission on August 1 and 2, 2002, and (4) follow-up testing from September 9 to November 17, 2002. On December 18, 2002, Ross initiated an internal appeal with respondent. When respondent denied the appeal, Ross took the second step in the internal appeal process. Respondent upheld its denial. On April 28, 2003, petitioner filed a request for external review with the Office of Financial and Insurance Services (OFIS)[4] under the Patient’s Right to Independent Review Act (PRIRA).[5]
The Commissioner of OFIS[6] accepted the request and assigned the case to Permidion, an independent review organization. The IRO submitted its initial decision on May 16, 2003. It concluded that Ross’s evaluation and admission to UAMS was an emergency and that it would have been inappropriate for Ross to have received care elsewhere. The IRO also concluded that the treatment provided was not experimental or investigational.
The commissioner asked the IRO for clarification in July 2003. She asked the IRO to consider four periods of care: (1) the June 30, 2002, outpatient consultation, (2) *181 the July 8 to July 23, 2002, inpatient admission, (3) the August 1 to August 2, 2002, inpatient admission, and (4) the September 9 to November 17, 2002, follow-up testing. The IRO recognized that the commissioner had specifically asked it to review “whether each of the ... four episodes meet[s] the criteria for emergency care under the insured’s policy, and at what point, if any, would the patient have been stabilized to make it ‘medically feasible’ to transfer care to an in-network facility.”
The IRO determined that it did not have the information required to offer an opinion about the August 1 and 2 treatment. But the IRO concluded that, with respect to the other periods, the treatment was appropriate. The IRO concluded that the initial consultation was emergency care and that it would have been improper to have transferred Ross to another facility because the “patient required ongoing treatment for a period of time under the supervision of his treating physician and it would have been inappropriate for the patient to receive treatment elsewhere.” Accordingly, the IRO recommended that respondent’s denial be reversed.
The commissioner requested even more review in October 2004. The October 2004 request was almost identical to the July 2003 request, and the IRO responded in kind. Specifically, the IRO reiterated its conclusion that the initial treatment constituted emergency services due to lack of a reasonable alternative at an in-network facility. It also again concluded that Ross “required ongoing treatment for his condition at a center that was familiar with his condition under the supervision of his treating physician.”
The commissioner made a final request for clarification in January 2005. She asked the IRO to again *182 consider whether Ross had been in an acute medical state in June 2002 and to clarify when Ross had been stabilized for transfer. The IRO responded by noting that Ross was one week away from death when he arrived at UAMS. The IRO also attached its response to the October 2004 request for review, in which it had concluded that it would have been inappropriate to have transferred Ross to another facility. Ultimately, the IRO again recommended that respondent’s denial of coverage be overturned for the periods at issue.
On March 30, 2005, nearly two years after petitioner requested external review, the commissioner issued her decision. She disregarded the IRO’s conclusions and found that only Ross’s July 8 through July 23, 2002, inpatient admission was covered treatment. She decided that this treatment alone constituted emergency care. Accordingly, the commissioner upheld respondent’s denial of coverage with respect to the remainder of UAMS’s services.
Petitioner filed an appeal in the Wayne Circuit Court. The circuit court reversed the commissioner’s decision and ordered respondent to pay for all the services rendered by UAMS. The circuit court reasoned that, because the commissioner had concluded that the July 8 to July 23 hospitalization constituted emergency services, all the services that UAMS provided were emergency services.
Respondent filed an application for leave to appeal in the Court of Appeals. The Court granted leave to appeal and, in a published opinion, affirmed in part and reversed in part the circuit court’s order.[7] The Court of Appeals reversed the decision requiring respondent to pay for services rendered after November 17, 2002, *183 because the commissioner had not addressed these services.[8] But the Court affirmed with respect to services provided before November 17, 2002.[9] It held that the commissioner had erred by discounting the IRO’s medical recommendations and replacing them with her own independent conclusions.[10]
THE PATIENT’S RIGHT TO INDEPENDENT REVIEW ACT
This case requires us to consider the final decision of an administrative agency and the correct interpretation of a statute. Issues of statutory interpretation are reviewed de novo.[11] In cases where no hearing is required, final decisions of administrative agencies are reviewed to determine whether the decision was authorized by law.[12] “[A]n agency’s decision that ‘is in violation of statute [or constitution], in excess of the statutory authority or jurisdiction of the agency, made upon unlawful procedures resulting in material prejudice, or is arbitrary and capricious,’ is a decision that is not authorized by law.”[13]
We have been asked to interpret the Patient’s Right to Independent Review Act. Under PRIRA, when an individual believes that a health-care coverage determination is incorrect, he or she has the right to request an independent review.[14] When the commissioner accepts a *184 request for external review and the review involves questions of medical necessity or clinical review, the commissioner is required to appoint an IRO to assess the services.[15] The IRO is directed to consider the relevant materials and recommend either upholding or reversing the earlier determination.[16] Upon receipt of the recommendation, the commissioner is authorized to review the IRO’s recommendation “to ensure that it is not contrary to the terms of coverage under the covered person’s health benefit plan with the health carrier.”[17]
Accordingly, under PRIRA, if a case accepted for external review involves an issue of medical necessity, an IRO must be appointed to make a recommendation. The commissioner, however, has the power to review the IRO’s recommendation. But that power is not unlimited. The issue here is whether the commissioner exceeds her power when she substitutes her opinion for the conclusion of the IRO on issues that require the exercise of medical judgment.
For many years, this Court has recognized the maxim expressio unius est exclusio alterius.[18] This maxim says that the “express mention in a statute of one thing implies the exclusion of other similar things.”[19] So well established is this maxim that it can be assumed that legislators are fully aware the courts will utilize it when construing their words. Accordingly, by expressly giving the commissioner the authority to review the recommendation to “ensure that it is not contrary to the *185 terms of coverage,” the Legislature implicitly barred the commissioner from reviewing the recommendation for any other purpose. As explained by the Court of Appeals:
[Wlhile the Legislature intended that the OFIS Commissioner would review the IRO’s recommendation for consistency and compliance with the health plan itself, the Legislature did not intend that the OFIS Commissioner would review or reevaluate the IRO reviewer’s specific medical or clinical findings. Instead, the language of PRIRA indicates that the Legislature intended the OFIS Commissioner to defer to the IRO’s recommendation on medical issues that do not implicate the language of the health plan itself.[20]
Thus, the commissioner is specifically authorized to review the IRO’s recommendation to ensure that it is not contrary to the “terms of coverage.” In this respect, the recommendation is not binding. But the commissioner is not allowed to substitute her lay opinion for the medical conclusions of the IRO.[21] Therefore, in *186 order to determine whether the commissioner exceeded the scope of her powers in this case, it is necessary to examine the “terms of coverage.”
Here, the IRO’s recommendation was consistent with the terms of coverage. Ross’s health-benefit plan covered services in cases of immediate and unforeseen medical emergency until such time as it was medically feasible to transfer him to an in-network provider. The IRO concluded that Ross’s initial treatment was a medical emergency. It also found that Ross “required ongoing treatment for a period of time under the supervision of his treating physician and it would have been inappropriate for [Ross] to receive treatment elsewhere.”
Also, as recognized by the Court of Appeals,
[respondent’s] schedule of benefits provides that respondent will provide treatment for “medical emergencies].” The schedule of benefits also provides coverage for related medically necessary services and related ancillary services. The IRO specifically concluded that Ross’s initial evaluation from June 30, 2002, until July 7, 2002, and his hospitalization of July 8 to 23, 2002, both constituted emergency services.
Further, as recognized by the OFIS Commissioner in her final opinion and order, Michigan law requires a health maintenance organization certificate, which otherwise provides coverage for emergency health services, to
“provide coverage for medically necessary services provided to an insured for the sudden onset of a medical condition that manifests itself by signs and symptoms of *187 sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in serious jeopardy to the individual’s health[,] ... serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. An insurer shall not require a physician to transfer a patient before the physician determines that the patient has reached the point of stabilization. An insurer shall not deny payment for emergency health services up to the point of stabilization provided to an insured under this subsection because of either of the following:
“(a) The final diagnosis.
“(b) Prior authorization was not given by the insurer before emergency health services were provided. [MCL 500.3406k(l).]”
MCL 500.3406k(l) goes on to define “stabilization” as “the point at which no material deterioration of a condition is likely, within reasonable medical probability, to result from or occur during transfer of the patient.” The IRO reviewer in this case specifically concluded that it would not have been medically feasible to transfer Ross at any time before November 17, 2002, because his condition had not been sufficiently stabilized and because his follow-up treatments at the Arkansas facilities were medically necessary.[22]
In summary, the plan covered medical emergencies up to the point where it was medically feasible to transfer the patient to an in-network facility. Michigan law also requires coverage for emergency health services until stabilization. The IRO determined that (1) the initial treatment was a medical emergency, (2) it was not appropriate to transfer Ross to an in-network facility, and (3) Ross was not stabilized before November 17, 2002.[23] Therefore, the IRO’s recommendation that respondent be ordered to pay for the services was *188 consistent with the terms of coverage.[24] For this reason, the commissioner’s decision to ignore the IRO’s recommendation was not authorized by law.
Aside from this inconsistency with the statutory language, an additional reason exists for not allowing the commissioner to substitute her opinion for the *189 conclusions of the IRO on issues requiring medical judgment. The commissioner is not a physician.[25] Her expertise is banking. By contrast, for an IRO to be approved, the IRO and its physicians must meet certain standards designed to ensure quality and credentials.[26] The commissioner is not a doctor, whereas the IRO is made up of very well-qualified doctors. I do not see how the commissioner’s decision to reject the IRO’s medical conclusions in favor of her own uneducated opinion is anything other than arbitrary and capricious. And a decision that is arbitrary and capricious is not authorized by law.[27]
In this case, the IRO’s physician, who is board-certified in internal medicine, medical oncology, and hematology, concluded that Ross’s initial evaluation constituted emergency services. The physician also concluded that it was not appropriate to transfer Ross to another facility before November 17, 2002. And Ross’s condition had not stabilized to the point where he could have been transferred to an in-network facility. Ross’s health plan covered medical emergencies until it was medically feasible to transfer him to an in-network provider. Michigan law also provides that “[a]n insurer shall not deny payment for emergency health services up to the point of stabilization . .. ,”[28] It follows that respondent was required to pay for the services provided through November 17, 2002.[29]
*190 Yet the commissioner found that only the July 8 to July 23, 2002, services were covered. In so doing, she necessarily rejected the medical findings of the IRO in favor of her own uneducated opinion. Not only was there no medical evidence supporting her decision, she is completely unqualified to offer a medical opinion. There could be no clearer example of an arbitrary and capricious decision.[30]
CONCLUSION
As the Court of Appeals recognized, the commissioner exceeds the scope of her power when she substitutes her opinion for the conclusion of an IRO on issues that require the exercise of medical judgment. This result is not only mandated by the statutory language, it is also necessary to avoid allowing the commissioner, a banker, to make medical decisions. Accordingly, I dissent. I would affirm the judgment of the Court of Appeals.
CAVANAGH, J. I would deny leave to appeal.

 Ante at 155.

 MCL 550.1911(15).

 Multiple myeloma is a cancer of the plasma cell. See Multiple Myeloma Research Foundation, About Myeloma <http://www. multiplemyeloma.org/about_myeloma> (last visited January 7, 2008).

 OFIS is now the Office of Financial and Insurance Regulation, effective April 6, 2008. Executive Order No. 2008-2.

 MCL 550.1901 et seq.

 The commissioner in this case was Linda A. Watters.

 Ross v Blue Care Network of Michigan, 271 Mich App 358; 722 NW2d 223 (2006).

 Id. at 381.

 Id. at 371.

 Id.

 Ostroth v Warren Regency, GP, LLC, 474 Mich 36, 40; 709 NW2d 589 (2006).

 Const 1963, art 6, § 28.

 Northwestern Nat’l Cas Co v Ins Comm’r, 231 Mich App 483, 488; 586 NW2d 563 (1998), quoting Brandon School Dist v Michigan Ed Special Services Ass’n, 191 Mich App 257, 263; 477 NW2d 138 (1991).

 MCL 550.1911(1).

 MCL 550.1911(6).

 MCL 550.1911(6), (11), and (13).

 MCL 550.1911(15).

 E.g., Peter v Chicago & W M R Co, 121 Mich 324, 329; 80 NW 295 (1899).

 Bradley v Saranac Community Schools Bd of Ed, 455 Mich 285, 298; 565 NW2d 650 (1997).

20 Ross, 271 Mich App at 377-378.

 The majority argues that my analysis using expressio unius est exclusio alterius leads to an interpretation that is contrary to the language of the statute. The majority claims that I fail to recognize that the commissioner is given the power to uphold or reverse an adverse determination, whereas the IRO is not. What the majority overlooks is that the commissioner’s power to review the IRO’s recommendation is limited to “ensur[ing] that it is not contrary to the terms of coverage . ...” Thus, the commissioner is authorized to reject the IRO’s recommendation only if it is contrary to the terms of coverage. It necessarily follows that the commissioner must adopt the IRO’s recommendation when it is not contrary to the terms of coverage. I recognize this point. The majority does not. Hence, it is the majority’s interpretation that is contrary to the language of the statute, not mine.
The interpretation of the statute advanced by the members of the majority is another example of their belief that the answer to all questions of statutory interpretation lies in a dictionary. As a result of this belief, they focus on the dictionary definition of the word “recom *186 mendation” to resolve the case. But the majority ignores the fact that the commissioner’s power of review is limited. Regardless of how the majority defines the word “recommendation,” the commissioner exceeds the scope of her power when she performs an act that she is not empowered to do. As I have explained, PRIRA gives the commissioner the power to review the recommendation solely to ensure that it is not contrary to the terms of coverage.

22 Ross, 271 Mich App at 378-379 (citations omitted).

 The majority claims that the IRO never concluded that Ross was not “stabiliz[ed]” as defined by MCL 500.3406k(2). I disagree. In her final *188 request for clarification, the commissioner specifically asked the IRO to consider whether Ross was stabilized as provided in MCL 500.3406k(2). In light of the commissioner’s specific request, there is only one reasonable way to read the IRO’s conclusion that respondent should be required to pay for the services: Ross was necessarily not “stabilizfed]” for transfer as that term is defined by MCL 500.3406k(2).
It seems to me that the majority’s problem with the IRO’s recommendation can be boiled down to two points. The first lies in the language that the IRO used in its reports. The majority goes so far as accusing the IRO of responding to the commissioner’s requests with “unresponsive answers.” Ante at 176 n 12. Given that the IRO is made up of doctors, not lawyers, it is not surprising that it did not use the legalistic language that the majority is looking for. But we have a duty to look beyond the language that is used to understand what the IRO was really saying. The commissioner repeatedly cited the relevant standards and asked the IRO to reevaluate its conclusion that respondent be required to pay for the services. Repeatedly, the IRO concluded that respondent should be required to pay for the services at issue. The commissioner made repeated requests citing the relevant standards and the IRO repeatedly replied that respondent should be required to pay for the services. Everything considered, the only way to read the IRO’s reports is to find that the IRO concluded that the treatment at issue fell within the terms of coverage.
The second point is that the majority apparently believes that the IRO decided that it was going to recommend that respondent be required to “pay for the services regardless of whether they fell within the terms of coverage.” Ante at 176 n 12.1 find nothing to indicate bias on the part of the IRO. Accordingly, I find it inappropriate for the majority to make this assumption. This faulty assumption lies at the heart of the majority’s decision.

 An example of a recommendation that would be contrary to the terms of coverage would be an IRO’s determination that mental-health services were medically necessary when the plan excluded coverage for mental-health services. In such a situation, the commissioner could reject the recommendation because the plan did not cover mental-health services.

 MCL 500.202 sets forth the qualifications of the commissioner. Notably absent is any requirement that the commissioner have any medical degree or license.

 MCL 550.1919.

 Northwestern Nat’l Cas, 231 Mich App at 488.

 MCL 500.3406k(1).

 The majority claims that “the commissioner’s determination was consistent with the IRO’s recommendation to the extent that the recommendation did not contradict the policy provisions or MCL 500.3406k.” Ante at 175. As I have explained, this simply is not true.

 The majority takes the position that a conclusion that Ross was not stabilized for transfer is arbitrary and capricious, given that UAMS discharged Ross on July 23, 2002. But the fact that Ross was discharged does not mean that it would have been appropriate to have transferred him to another facility. In fact, in its discharge summary UAMS specifically indicated that Ross required “outpatient followup.” The IRO’s physician, who is a medical expert, reviewed the relevant materials and reached the medical conclusion that it would have been inappropriate to have transferred Ross to another facility. As the IRO uses physicians medically trained to reach such conclusions, the majority’s suggestion that the IRO’s conclusion was arbitrary and capricious is preposterous.
In addition, there is no evidence that the services Ross required were offered by an in-network provider. Without proof that an in-network provider offered the requisite services, it is impossible to conclude that transfer would have been appropriate.