**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:       Justices:
Clifford W. Taylor   Michael F. Cavanagh
                     Elizabeth A. Weaver
                     Marilyn Kelly
                     Maura D. Corrigan
                     Robert P. Young, Jr.
                     Stephen J. Markman

FILED APRIL 23, 2008

DESIREE E. ROSS, Personal Representative
of the Estate of DOUGLAS G. ROSS,

       Petitioner-Appellee,

v                                   No. 131711

BLUE CARE NETWORK OF MICHIGAN,

       Respondent-Appellant.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, C. J.

At issue in this action brought pursuant to the Patient's Right to Independent Review Act (PRIRA), MCL 550.1901 *et seq.*, is whether the Commissioner of the Office of Financial and Insurance Services (OFIS)[1] is bound by the recommendations of an independent review organization (IRO) on issues of medical necessity and clinical review. We conclude that the act provides that the commissioner is not bound by such recommendations. Accordingly, we reverse

----

[1] OFIS is now the Office of Financial and Insurance Regulation, effective April 6, 2008. Executive Order No. 2008-2.

the judgment of the Court of Appeals and the order of the trial court that held to the contrary and remand this matter to the trial court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

Douglas Ross was covered under the health maintenance organization (HMO) health plan of respondent Blue Care Network of Michigan (BCN). The certificate of coverage excluded out-of-network services that were not preauthorized.[2] However, it did provide coverage for medically necessary services without prior authorization in cases of immediate and unforeseen medical emergency, but only until such time as it became medically feasible to transfer the person covered under the health plan to an in-network provider.[3]

---

[2] Section 2.01 of the certificate provided:

The Health Plan is not an insurance company but a health maintenance organization which operates on a direct service basis. Health, medical, hospital, and other services obtained by a Member outside of the Health Plan and not pre-authorized by a Plan Physician are not a covered benefit under this Certificate and cannot be reimbursed to the Member or paid for by the Health Plan.

[3] Section 1.05 of the certificate provided:

A. . . . Coverage is provided for medically necessary emergency services when they are needed immediately because of an accidental injury or sudden illness, and the time required to contact your Primary Care Physician could result in permanent damage to your health. All benefits under this Certificate must be provided or authorized by your Primary Care Physician or BCN, except in the case of an immediate and unforeseen medical emergency.

* * *

(continued…)

In March 2002, Ross contracted an acute form of multiple myeloma. Ross was referred to the University of Michigan Medical Center, an in-network provider, which in a May 28, 2002, letter recommended to Dr. Stephen Goldfarb, one of Ross's oncologists, that Ross receive a stem-cell transplant and advised that it had given Ross information on bone-marrow transplants and instructed Ross to discuss this option with Dr. Goldfarb. According to Desiree Ross (petitioner), who is Ross's wife and the personal representative of his estate, Ross's condition began to spiral out of control toward the end of June 2002, Ross's oncologist told him that he was no longer eligible for treatment at the University of Michigan Medical Center because the cancer had spread to his soft tissue, and Ross was consigned to palliative treatment. She also claimed that Dr. Ronald Lutsic, a radiation oncologist, told her in June 2002 that Ross's prognosis was dismal and that if he were Ross, he would go to the Myeloma Institute in Little Rock,

(…continued)
   2. Medical Emergency means a sudden and immediate medical condition which could be expected to result in permanent damage to your health if not treated immediately.

* * *

   C. All follow-up care to initial emergency treatment . . . is covered only when provided or approved by BCN or by your Primary Care Physician.

   D. If a Member is hospitalized for emergency care in a non-affiliated hospital or outside of the BCN service area, BCN may require that the Member be transferred to an affiliated hospital or
(continued…)

Arkansas (the facility), one of two facilities in the world that treated multiple myeloma.

Petitioner called Ross's primary care physician (PCP), Dr. Michael Silverstone, to ask for a referral to the facility, which was not a BCN in-network provider. BCN advised that it needed to review the facility's treatment plan and that it would take 10 to 14 days to review the request. The facility said that it could not provide a treatment plan without first evaluating Ross.

On July 2, 2002, Ross went to Arkansas and began an evaluation at the facility without BCN's approval. On July 8, 2002, Dr. Frits van Rhee, the evaluating doctor, admitted Ross to the hospital, noting that without aggressive intervention, Ross had only about seven days to live. Ross was hospitalized from July 8, 2002, to July 23, 2002. The July 23, 2002, discharge summary indicated that Ross was "stable for discharge and outpatient followup . . . ." In the meantime, Ross had received notices from BCN on July 9, July 15, and July 16 denying coverage for treatment at the facility because either the services were available in-network or there was no referral from his PCP, and advising Ross to contact his PCP for a referral to an in-network provider.

Although petitioner claimed that BCN never informed her of any in-network providers that could treat Ross's condition, she did not indicate that she

_____

(…continued)
other facility within the service area *as soon as medically feasible*. [Emphasis added.]

4

had contacted Ross's PCP as advised by BCN for such a referral, and she did not present any evidence that the University of Michigan Medical Center was unable to administer the same treatment Ross received at the facility. Ross continued with both outpatient and inpatient treatment at the facility without BCN's authorization until March 2003. He died on April 6, 2003. BCN refused to cover any evaluation or treatment at the facility.

On December 18, 2002, pursuant to BCN's internal procedures, petitioner initiated a "step one" appeal of the denial of coverage for Ross's treatment at the facility that had begun on June 30, 2002. BCN denied the appeal on January 9, 2003, because (1) the PCP had not referred Ross, (2) BCN had not authorized the services and there was no indication that the services were not available in-network, and (3) BCN considered the facility's services to be experimental. On February 6, 2003, petitioner filed a "step two" internal appeal, which BCN denied. On April 28, 2003, petitioner appealed to OFIS under PRIRA. The commissioner accepted the request and assigned the case to an IRO.

The IRO's initial report, dated May 16, 2003, indicated that "this must be considered an emergency evaluation and admission in the mind of a prudent patient," that attempts were made to use in-network providers, that Ross was not offered a reasonable alternative plan of care that would address his condition, and that the treatment he received at the facility should not have been considered experimental. After receiving the initial report, the commissioner repeatedly sought to compel the IRO to apply the contractual and statutory standards rather

5

than the IRO-imposed prudent-patient standard for evaluating an emergency,[4]

---

[4] We quote here one of the questions in the commissioner's October 2004 request for clarification of the IRO's recommendation and the IRO's November 2004 response to that question as just one example of how the commissioner repeatedly sought to compel the IRO to apply the statutory standards and how the IRO unwarrantedly declined to do so:

[Q.] Michigan law requires coverage for emergency treatment up to the point of stabilization. At what point after Mr. Ross' admission on July 8, 2002 was he stabilized. Dr. VanRhee, the admitting and treating physician stated Mr. Ross began DT PACE chemotherapy on July 10, 2002 and within 7 days Myeloma was back under control. Can it be assumed that Mr. Ross was stable by July 18, 2002?

[A.] The patient subsequently developed severe and life-threatening complications of his disease process, requiring admission to the University of Arkansas Medical Center July 8, 2002.

Blue Care Network's policy on Emergency Care Section 1.04 D. [sic] states, "If a Member is hospitalized for emergency care in a nonaffiliated hospital or outside of the BCN service area, BCN may require that the member be transferred to an affiliated hospital or other facility within the services area as soon as medically feasible.["] It is the opinion of this reviewer that it was not medically feasible or appropriate to transfer the enrollee to another facility, which was not involved with the patient's course of treatment. It would have been inappropriate to attempt to transfer the patient across the country for treatment at a network facility at any time during his July 8 - July 23, 2002 inpatient admission episode.

He required treatment for his condition at a center that was familiar with his condition under the supervision of his treating physician.

This reviewer does not have adequate clinical information about the August 1 - August 2, 2002 inpatient admission; therefore, no decision can be rendered regarding this episode.

(continued…)

6

sending the IRO three requests for clarification whether the June 30, 2002, outpatient consultation, the July 8, 2002, to July 23, 2002, inpatient admission, the August 1, 2002, to August 2, 2002, inpatient admission, and the September 9, 2002, to November 17, 2002, follow-up testing constituted emergency care, which would be covered under the certificate of coverage, as well as under MCL

---

(…continued)

> The follow-up testing was to evaluate the health of the patient and the effectiveness of the treatment given to this patient. This reviewer does not have the specifics as to the care provided, but it would be inappropriate to "transfer" this responsibility to another facility, which was not involved with this patient's course of treatment. It is the opinion of this reviewer that it is inappropriate to unbundle the care provided to this patient for his refractory myeloma and that it is appropriate to look at the global care provided for this illness. Given the sense of emergency and life-threatening nature of the patient's condition without effective therapy, the care, provided at the University of Arkansas Medical Center, was appropriate treatment.

When viewing the question and the answer in its entirety, it is clear that the IRO's statement that "it was not medically feasible or appropriate to transfer [Ross] to another facility" referred to the July 8, 2002, to July 23, 2002, admission, while the remainder of the IRO's answer addressed the subsequent periods of treatment. The IRO did not indicate with respect to these subsequent periods that transfer would have been medically infeasible; rather, the IRO indicated only that it would have been inappropriate to transfer Ross to another facility. Justice Kelly argues, *post* at 13 n 23: "Given that the IRO is made up of doctors, not lawyers, it is not surprising that [the IRO] did not use the legalistic language that the majority is looking for." In response, we note that the term "medically feasible" used in the certificate of coverage was not defined in such a manner that a doctor, who has extensive education, would be unable to understand or apply the term. Moreover, the IRO demonstrated in its November 2004 response that the IRO's physician reviewer was perfectly capable of using the term "medically feasible" and applying, even citing, the language in BCN's certificate when the reviewer deemed it appropriate to do so.

7

500.3406k,[5] and whether Ross became stabilized at any point so as to make it medically feasible to transfer him to an in-network facility.

The IRO responded that Ross was admitted to the facility on an emergency basis and that it was not appropriate to transfer him to an in-network facility for treatment or follow-up because the in-network facility was not involved in Ross's treatment. In the IRO's last two responses, it stated that it was not medically feasible to transfer Ross from July 8, 2002, to July 23, 2002, and that it was

---

[5] MCL 500.3406k of the Insurance Code provides that an HMO must, if it provides a certificate of medical coverage, cover emergency medical services until the insured is stabilized and defines "stabilization":

(1) . . . [A] health maintenance organization contract shall provide coverage for medically necessary services provided to an insured for the sudden onset of a medical condition that manifests itself by signs and symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in serious jeopardy to the individual's health . . . , serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. An insurer shall not require a physician to transfer a patient before the physician determines that the patient has reached the point of stabilization. An insurer shall not deny payment for emergency health services up to the point of stabilization provided to an insured under this subsection because of either of the following:

(a) The final diagnosis.

(b) Prior authorization was not given by the insurer before emergency health services were provided.

(2) As used in this section, "stabilization" means the point at which no material deterioration of a condition is likely, within reasonable medical probability, to result from or occur during transfer of the patient.

8

inappropriate to unbundle the remaining care provided. The only time the IRO stated that it was not medically feasible to transfer Ross was in response to the commissioner's question regarding the July 8, 2002, to July 23, 2002, admission. The IRO recommended on three separate occasions that BCN's denial of petitioner's claim be overturned.

The commissioner found that only the inpatient admission to the facility from July 8, 2002, to July 23, 2002, was a medical emergency under the definition of "emergency care" in BCN's health plan. She upheld the denial regarding the remainder of the services on the grounds that (1) out-of-network services were not covered; (2) BCN did not approve the out-of-network services; (3) there was no evidence that treatment was unavailable within the network, given that Ross's PCP had referred him to the University of Michigan Medical Center, a multidisciplinary cancer treatment center; and (4) other than the July 8, 2002, to July 23, 2002, hospitalization, the care was not emergency care under the policy or Michigan law.

Petitioner appealed the commissioner's decision in the circuit court, arguing alternatively (1) that it was not medically feasible to transfer Ross to an in-network facility because of the emergency nature of his condition; (2) that Ross had a referral from his PCP, so the services did not need to constitute emergency medical care; and (3) that the services were not available in-network. Focusing on the argument that the services were emergency services, the circuit court reversed the part of the commissioner's decision that upheld BCN's denial of coverage,

9

reasoning that the commissioner's conclusion—that some but not all of the facility's services were emergency services—was unauthorized by law.

The Court of Appeals granted BCN's application for leave to appeal and affirmed with respect to the services provided through November 17, 2002. *Ross v Blue Care Network of Michigan,* 271 Mich App 358; 722 NW2d 223 (2006). It reasoned that the commissioner had failed to comply with the requirements of PRIRA and exceeded her authority when she discounted the IRO's medical recommendations and replaced them with her own independent determinations. *Id.* at 371. The panel concluded that the statement in *English v Blue Cross Blue Shield of Michigan,* 263 Mich App 449, 464; 688 NW2d 523 (2004)—that an IRO's recommendation was not binding on the commissioner—was merely dictum because the *English* panel was never actually presented with the question whether an IRO's recommendation is binding on the commissioner. *Ross, supra* at 373-375.

Alternatively, the Court concluded that even if the statement in *English* were binding on the Court, the *English* panel had recognized that the commissioner's independent review of the IRO's recommendation under MCL 550.1911(15) was limited to confirming that the recommendation did not contradict the health-plan provisions. *Ross, supra* at 375. However, the *Ross* panel agreed with BCN that the circuit court erroneously required it to pay for evaluation and treatment after November 17, 2002, because the commissioner had not considered the care Ross received after that date. *Id.* at 380-381.

10

BCN applied for leave to appeal in this Court. We ordered oral argument on the application and specifically directed the parties to address whether the Court of Appeals paid sufficient attention to the provisions of PRIRA that require an IRO to provide a "recommendation" to the commissioner, and whether the Court of Appeals properly characterized as dictum the statement in *English* that indicated that the IRO's recommendation was not binding on the commissioner. 477 Mich 960 (2006). The commissioner has filed an amicus curiae brief in support of BCN's application.

## II. STANDARD OF REVIEW

The interpretation of statutes presents an issue of law, which is reviewed de novo. *Lapeer Co Clerk v Lapeer Circuit Judges,* 465 Mich 559, 566; 640 NW2d 567 (2002). Decisions of an administrative agency or officer, in cases in which no hearing is required, are reviewed to determine whether the decisions are authorized by law. Const 1963, art 6, § 28.

## III. ANALYSIS

PRIRA is a relatively recent addition to our state's laws. Enacted in 2000 as part of the Legislature's across-the-board attempt to regulate HMOs and other insurance providers consistently,[6] PRIRA was intended to standardize the external

---

[6] PRIRA was introduced as HB 5576, enacted as 2000 PA 251, and amended by 2000 PA 398. HB 5576 was considered in conjunction with HB 5573, HB 5574, and HB 5575. At the same time that the House bills were being considered, SB 1211 and SB 1209 were also being considered. 2000 PA 252 (SB 1209) repealed part 210 of the Public Health Code (MCL 333.21001 through

(continued…)

review process designed to resolve disputes over covered benefits, establish IRO qualifications, and provide for penalties in cases of wrongful denial of benefits.

Under PRIRA, the external review process of adverse determinations made by health carriers is governed by MCL 550.1911, which provides:

> (1) Not later than 60 days after the date of receipt of a notice of an adverse determination . . . , a covered person . . . may file a request for an external review with the commissioner. . . .
>
> (2) Not later than 5 business days after the date of receipt of a request for an external review, the commissioner shall complete a preliminary review of the request to determine all of the following:
>
> (a) Whether the individual is or was a covered person in the health benefit plan . . . .
>
> (b) Whether the health care service . . . reasonably appears to be a covered service under the covered person's health benefit plan.
>
> (c) Whether the covered person has exhausted the health carrier's internal grievance process . . . .
>
> (d) The covered person has provided all the information and forms required . . . .
>
> (e) Whether the health care service . . . appears to involve issues of medical necessity or clinical review criteria.

(…continued)
333.21098), which had previously regulated HMOs; brought HMOs under the authority of the OFIS commissioner by adding chapter 35, entitled "Health Maintenance Organizations" to the Insurance Code; and amended MCL 500.2213 to provide that HMOs must establish an internal review procedure and that insurers must notify insureds of the right to independent review under PRIRA. 2000 PA 253 (SB 1211) amended MCL 333.20106, MCL 333.20124, MCL 333.20161, and MCL 333.22205 of the Public Health Code to make technical changes regarding HMOs in light of the transfer of the regulatory framework pertaining to HMOs from the Public Health Code to the Insurance Code. 2000 PA 250 (HB 5573) amended MCL 550.1404 of the Nonprofit Health Care Corporation Reform Act to provide for independent external review under PRIRA.

(3) Upon completion of the preliminary review under subsection (2), the commissioner immediately shall provide a written notice . . . as to whether the request is complete and whether it has been accepted for external review.

(4) If a request is accepted for external review, the commissioner shall do both of the following:

(a) Include in the written notice under subsection (3) a statement that the covered person . . . may submit to the commissioner . . . additional information and supporting documentation that the reviewing entity shall consider when conducting the external review.

(b) Immediately notify the health carrier in writing of the acceptance of the request for external review.

(5) If a request is not accepted for external review because the request is not complete, the commissioner shall inform the covered person . . . what information or materials are needed to make the request complete. If a request is not accepted for external review, the commissioner shall provide written notice . . . to the covered person . . . and the health carrier of the reasons for its nonacceptance.

(6) If a request is accepted for external review and appears to involve issues of medical necessity or clinical review criteria, the commissioner shall assign an independent review organization . . . . The assigned independent review organization shall be approved . . . to conduct external reviews and shall provide a written *recommendation* to the commissioner on whether to uphold or reverse the adverse determination . . . .

(7) If a request is accepted for external review, does not appear to involve issues of medical necessity or clinical review criteria, and appears to only involve purely contractual provisions of a health benefit plan, such as covered benefits or accuracy of coding, the commissioner may keep the request and conduct his or her own external review or may assign an independent review organization as provided in subsection (6) . . . . Except as otherwise provided in subsection (16), if the commissioner keeps a request, he or she shall review the request and issue a decision . . . within the same time limits and subject to all other requirements of this act for requests assigned to an independent review organization. If at any time during the commissioner's review of a request it is determined that a

13

request does appear to involve issues of medical necessity or clinical review criteria, the commissioner shall immediately assign the request to an independent review organization . . . .

(8) In reaching a *recommendation*, the reviewing entity is not bound by any decisions or conclusions reached during the health carrier's utilization review process or the health carrier's internal grievance process.

(9) Not later than 7 business days after the date of the notice under subsection (4)(b), the health carrier . . . shall provide . . . the documents and any information considered in making the adverse determination . . . .

(10) Upon . . . notice from the assigned independent review organization that the health carrier . . . has failed to provide the documents and information within 7 business days, the commissioner may terminate the external review and make a decision to reverse the adverse determination . . . .

(11) The reviewing entity shall review all of the information and documents received under subsection (9) and any other information submitted . . . .

\* \* \*

(13) In addition to the documents and information provided under subsection (9), the reviewing entity . . . shall consider the following in reaching a *recommendation*:

(a) The covered person's pertinent medical records.

(b) The attending health care professional's recommendation.

(c) Consulting reports from appropriate health care professionals and other documents submitted by the health carrier, the covered person, the covered person's authorized representative, or the covered person's treating provider.

(d) The terms of coverage under the covered person's health benefit plan with the health carrier.

(e) The most appropriate practice guidelines, which may include generally accepted practice guidelines, evidence-based practice guidelines, or any other practice guidelines developed by

the federal government or national or professional medical societies, boards, and associations.

(f) Any applicable clinical review criteria developed and used by the health carrier or its designee utilization review organization.

(14) The assigned independent review organization shall provide its *recommendation* to the commissioner not later than 14 days after the assignment by the commissioner of the request for an external review. The independent review organization shall include in its *recommendation* all of the following:

(a) A general description of the reason for the request for external review.

(b) The date the independent review organization received the assignment from the commissioner to conduct the external review.

(c) The date the external review was conducted.

(d) The date of its *recommendation*.

(e) The principal reason or reasons for its *recommendation*.

(f) The rationale for its *recommendation*.

(g) References to the evidence or documentation, including the practice guidelines, considered in reaching its *recommendation*.

(15) Upon receipt of the assigned independent review organization's *recommendation* under subsection (14), the commissioner immediately shall review the *recommendation* to ensure that it is not contrary to the terms of coverage under the covered person's health benefit plan with the health carrier.

(16) The commissioner shall provide written notice . . . to the covered person . . . and the health carrier of the decision to uphold or reverse the adverse determination . . . not later than 7 business days after the date of receipt of the selected independent review organization's *recommendation*. . . .  The commissioner shall include in a notice under this subsection all of the following:

(a) The principal . . . reasons for the decision . . . .

15

(b) If appropriate, the principal . . . reasons why the commissioner did not follow the assigned independent review organization's *recommendation*. [Emphasis added.]

To summarize, under MCL 550.1911, the commissioner has discretion to accept or reject a request for an external review, MCL 550.1911(3). If a request is accepted, the covered person is permitted to submit "additional information and supporting documentation," MCL 550.1911(4)(a), and the health carrier is required to submit "the documents and any information considered in making the adverse determination," MCL 550.1911(9).

If an accepted request "involve[s] purely contractual provisions," the commissioner has discretion to conduct his or her own external review, MCL 550.1911(7). If, however, an accepted request "involve[s] issues of medical necessity or clinical review criteria," [7] the commissioner must assign an IRO to conduct the external review, MCL 550.1911(6). IROs conduct their external reviews through clinical peer reviewers, who must be physicians or meet the requirements found in MCL 550.1919(2)[8] for health care professionals. In

---

[7] "Clinical review criteria" is defined as "the written screening procedures, decision abstracts, clinical protocols, and practice guidelines used by a health carrier to determine the necessity and appropriateness of health care services." MCL 550.1903(f).

[8] MCL 550.1919(2) provides in relevant part:

A clinical peer reviewer . . . shall be a physician or other appropriate health care professional who meets all of the following minimum qualifications:

(continued…)

16

reaching a recommendation, the IRO is not bound by any prior decision or conclusion, MCL 550.1911(8). After reviewing all information, the IRO makes a recommendation concerning whether the commissioner should uphold or reverse the health carrier's decision, MCL 550.1911(6). This recommendation must be provided within 14 days of receiving the assignment, MCL 550.1911(14).

The commissioner, who is not required to have any medical knowledge, then reviews the recommendation to ensure that it is not contrary to the terms of coverage under the covered person's health benefit plan with the health carrier, MCL 550.1911(15). The commissioner has seven days to decide whether to uphold or reverse the health carrier's decision, MCL 550.1911(16). The commissioner must provide the reasons for his or her decision, including the reasons why he or she decided not to follow the IRO's recommendation, MCL

---

(…continued)

      (a) Is an expert in the treatment of the covered person's medical condition that is the subject of the external review.

      (b) Is knowledgeable about the recommended health care . . . treatment because he or she devoted in the immediately preceding year a majority of his or her time in an active clinical practice within the medical specialty most relevant to the subject of the review.

      (c) Holds a nonrestricted license . . . and, for physicians, a current certification by a recognized American medical specialty board in the . . . areas appropriate to . . . the external review.

      (d) Has no history of disciplinary actions . . . that raise a substantial question as to the clinical peer reviewer's physical, mental, or professional competence or moral character.

17

550.1911(16)(b). Finally, a party aggrieved by the commissioner's decision may seek judicial review, MCL 550.1915(1).[9]

As can be seen from this statutory scheme, it is hard to imagine a more comprehensive review process. And this comprehensive scheme in MCL 550.1911 refers 13 times to an IRO's recommendation.[10]

In its opinion, the Court of Appeals neither defined the term "recommendation" nor considered the significance of its use by the Legislature. "Recommendation" is defined as "the act of recommending." *Random House Webster's College Dictionary* (2005). "Recommending" is the gerund form of "recommend," which is defined as "to urge or suggest as appropriate . . . ." *Id.* "Suggest" is defined as "to mention, introduce, or propose (an idea, plan, person, etc.) for consideration, possible action, or some purpose or use." *Id.* Clearly, to make a "recommendation" means to suggest or propose something; "recommendation" is not a word that connotes mandatory compliance. Nowhere

---

[9] MCL 550.1915(1) provides in relevant part: "An external review decision and an expedited external review decision are the final administrative remedies available under this act. A person aggrieved by [such a] decision may seek judicial review . . . ."

[10] In response to Justice Kelly's analysis using the doctrine of *expressio unius est exclusio alterius,* we point out that MCL 550.1911(16) *expressly* gives the commissioner authority to uphold or reverse an insurer's adverse determination. Nowhere in the statute is there a similar provision that grants an IRO comparable authority. Thus, Justice Kelly's application of the doctrine of *expressio unius est exclusio alterius* is unpersuasive because it leads to an interpretation that is contrary to the unambiguous language of the statute. See *Luttrell v Dep't of Corrections,* 421 Mich 93, 107; 365 NW2d 74 (1984).

18

in the statute does it say that the IRO's recommendation is binding in any way, so there is nothing that would require us to impute a meaning other than the plain meaning of the term "recommendation." Moreover, the nature of the term "recommendation" as connoting a suggestion is reinforced by MCL 550.1911(16)(b), which expressly allows the commissioner to decline to follow the IRO's recommendation as long as the commissioner explains his or her reasons for doing so.[11]

---

[11] According to Justice Kelly, the commissioner acted in an arbitrary and capricious manner when she rejected the IRO's conclusions about medical necessity. In reaching this conclusion, Justice Kelly claims: "The IRO determined that (1) the initial treatment was a medical emergency, (2) it was not appropriate to transfer Ross to an in-network facility, and (3) Ross was not stabilized before November 17, 2002." *Post* at 12. We disagree that the IRO concluded that Ross was not stabilized. The term "stabilization," as defined by MCL 500.3406k(2) means "the point at which no material deterioration of a condition is likely, within reasonable medical probability, to *result from or occur during transfer of the patient.*" (Emphasis added.) On July 23, 2002, Ross was *discharged* from the facility, and the discharge summary indicated Ross was "stable for discharge." It is axiomatic that if a patient is stable for discharge, the patient may be transferred without the likelihood of a material deterioration in the patient's condition resulting from or occurring during transfer. We emphasize that the *only* period for which the IRO specifically indicated that it was not medically feasible to transfer Ross was from July 8, 2002, to July 23, 2002, *even when specifically asked at what point Ross was stabilized for transfer.* With respect to the subsequent periods, the IRO merely characterized the possibility of a transfer as improper. The IRO's rationale for finding that transfer was improper was not because Ross's medical condition would likely have deteriorated during transfer (the standard required under MCL 500.3406k), but because it would have been inappropriate to "unbundle" the remaining care. Thus, Justice Kelly's characterization of the IRO's finding—that Ross was not stabilized before November 17—is faulty. Nevertheless, had the IRO found on these facts that Ross was not stabilized before November 17, i.e., that his condition was likely to deteriorate if he was transferred, such a finding would itself have been arbitrary and capricious, and, if the commissioner had blindly accepted such a finding, the commissioner's actions

(continued…)

---

19

In the only Michigan case before this one to address PRIRA, *English,* the Court of Appeals likewise noted that an IRO's recommendation was not binding on the commissioner. *English, supra* at 464. In *English,* the commissioner partially reversed Blue Cross's denial of coverage for various blood tests because she found, consistently with the IRO's recommendation, that the tests were medically necessary. *Id.* at 453. In response to Blue Cross's argument that it was denied due process because it did not know the identity, and could not challenge the recommendation, of the IRO, the Court of Appeals distinguished the authority cited by Blue Cross because in those cases, which held that due process had been denied, the evidence was unknown to the parties, while in *English*, the IRO's recommendation was not evidence, but was merely a tool to aid the commissioner, and the recommendation was not binding on the commissioner. *Id.* at 464.

The Court of Appeals in the instant case declared that this statement in *English* did not bind the Court because whether an IRO's recommendation was binding on the commissioner was not at issue in *English* given that the commissioner agreed with the IRO's recommendation. *Ross, supra* at 374. In reaching this conclusion, the Court of Appeals failed to recognize or address the significance of the reason the *English* panel made the statement in the first place, which was to distinguish the cases cited by Blue Cross in support of its argument

(…continued)
would likewise have been arbitrary and capricious. However, according to Justice Kelly's reasoning, this is exactly what the commissioner would be required to do.

20

on denial of due process, an issue that most certainly was before the Court. The *English* panel held in part that PRIRA did not violate the parties' due process rights *because* the IRO's recommendation is not binding on the commissioner. Thus, its conclusion that an IRO's recommendation is not binding on the commissioner is clearly not dictum. Instead, it was one of the reasons that the panel held that PRIRA did not violate the parties' due process rights. When necessary to determine an issue in a case, a statement of law cannot be dictum. *Wold Architects & Engineers v Strat,* 474 Mich 223, 232 n 3; 713 NW2d 750 (2006).

In sum, by failing to recognize the significance of the use of the term "recommendation" and declining to follow *English,* the Court of Appeals applied a flawed construction of the statute to conclude that

> while the Legislature intended that the OFIS Commissioner would review the IRO's recommendation for consistency and compliance with the health plan itself, the Legislature did not intend that the OFIS Commissioner would review or reevaluate the IRO reviewer's specific medical or clinical findings. Instead, the language of PRIRA indicates that the Legislature intended the OFIS Commissioner to defer to the IRO's recommendation on medical issues that do not implicate the language of the health plan itself. [*Ross, supra* at 377-378.]

This construction essentially created a judicially defined bifurcated system of review in which the IRO would be the final authority on issues of medical or clinical-review criteria, while the commissioner would be the ultimate authority on purely contractual issues. Such a construction was not supported by the plain and unambiguous language of the act itself. Given the all-encompassing,

21

comprehensive scheme set forth in PRIRA, the absence of such a bifurcated review process in the statute convincingly demonstrates that the Legislature did not intend that the review authority be bifurcated. In fact, as previously noted, the opposite intent is demonstrated by the frequent use of the term "recommendation," as well as by MCL 550.1911(16)(b), which provides that the commissioner must give the principal reasons why he or she did not follow the IRO's recommendation.

Furthermore, the Legislature has contemplated in MCL 550.1911(7) that there may be situations involving purely contractual issues over which the commissioner has sole authority. Similarly, the Legislature has treated medical issues as implicating contractual matters also and has not established that the commissioner's authority is different. That is, the commissioner has identical authority over both contractual and medical issues. The Court of Appeals failed to recognize this and erred in concluding that "medical issues" were to be treated differently. The act provides for no such bifurcation. Rather, when the Legislature charged the commissioner with ensuring that the IRO's recommendation was consistent with the terms of coverage, it necessarily authorized the commissioner to review issues of medical necessity pertaining to those terms of coverage.

In any event, the commissioner's determination *was* consistent with the IRO's recommendation to the extent that the recommendation did not contradict

22

the policy provisions or MCL 500.3406k.[12]  The *only* period for which the IRO

stated that it was not medically feasible—the standard required in the policy—to

---

[12] Justice Kelly asserts that the only reasonable way to read the IRO's response to the commissioner's last request for clarification is that the IRO concluded that "Ross was necessarily not 'stabiliz[ed]' for transfer as that term is defined by MCL 500.3406k(2)."  *Post* at 12 n 23.  From this response, Justice Kelly claims that the IRO concluded that Ross was not stabilized before November 17, 2002.  Again, this requires us to include the relevant question from the commissioner's January 26, 2005, clarification request and the IRO's March 9, 2005, response to that question in their entirety:

> [*Q.*] The Michigan statute governing emergency health services, MCL 500.3406k, requires coverage for "medically necessary services" to the insured "for the sudden onset of a medical condition that manifests itself by signs and symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in serious jeopardy to the individual's health . . . serious impairment to bodily functions, or serious dysfunction of any bodily organ or part."  The statute further provides that "an insurer shall not require a physician to transfer a patient before the physician determines that the patient has reached the point of stabilization."  Stabilization is defined as "the point at which no material deterioration of a condition is likely, within reasonable medical probability, to result from or occur during transfer of the patient".  Based on the available records, at which point after [Ross] was hospitalized on July 8, 2002 would no material deterioration of his condition likely result from or occur during transfer of [Ross] to a network hospital?  What medical services were necessary to stabilize [Ross] under the statute's definition of stabilization?

> [*A.*] This issue was addressed in a conference call on Wednesday, February 9, 2005 by Dr. David Sand, Medical Director, Permidion.  [Ross] had methicillin-resistant Staphylococcus aureus septicemia following his DT-PACE chemotherapy.  The University Hospital of Arkansas discharge summary dictated September 15, 2002 documents [Ross's] clinical status from August 16, 2002 through September 9, 2002.  [Ross] could not have been transferred or released prior to his discharge date.

23

move Ross to an in-network facility was the period from July 8, 2002, to July 23, 2002, and it was for services provided during this period that the commissioner

reversed BCN's denial of coverage.[13]  The IRO's finding that it was "inappropriate" to move Ross to another facility after July 23, 2002, was not based on a standard set forth in either the policy or the statute.  Those standards were that it be medically feasible to move the patient or that the patient be stabilized before being moved, respectively.  Thus, the IRO's error was one that involved

Notwithstanding the fact that the period of August 16, 2002, through September 9, 2002, was not a period the IRO was *ever* asked to address, we include this question and answer for two reasons.  First, it is an excellent illustration of the IRO's unresponsive answers to the commissioner's increasingly more specific questions, which prompted the commissioner to seek clarification of the IRO's recommendation on three separate occasions.  Second, it illustrates how unreasonable it is to assert that the IRO concluded that Ross was not stabilized before November 17, 2002, when the IRO's answer, which relied on a September 15, 2002, discharge summary, is completely silent with respect to any time after September 9, 2002.  Although we agree with Justice Kelly that the IRO repeatedly responded that BCN should be required to pay for the services, we disagree that the only way to read the IRO's reports is to conclude that the treatment at issue fell within the terms of coverage.  Rather, given that the IRO demonstrated it was capable of understanding and applying the standards with respect to the July 8, 2002, to July 23, 2002, hospitalization, and that it repeatedly refused to apply the standards with respect to the remaining periods of care, we think it clear that the IRO thought BCN should pay for the services *regardless* of whether they fell within the terms of coverage.

[13]  The Court of Appeals determination—that the IRO specifically concluded it was not medically feasible to transfer Ross before November 17, 2002, *Ross, supra* at 379—was clearly in error because it contradicted the IRO's own statements as well as the facility's July 23, 2002, discharge summary, which indicated that Ross was "stable for discharge and outpatient followup . . . ."

contractual and statutory construction—error that the commissioner correctly rectified.


## IV. CONCLUSION

Under the PRIRA provisions for an independent external review of an adverse determination regarding coverage, an IRO's recommendation concerning whether to uphold or reverse a health carrier's adverse determination is merely a recommendation and is not binding on the commissioner. We reverse the judgments of the trial court and the Court of Appeals, which held otherwise, and remand the case to the trial court for further proceedings.

Reversed and remanded to the trial court.


Clifford W. Taylor
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen P. Markman

STATE OF MICHIGAN

SUPREME COURT

DESIREE E. ROSS, personal representative
of the estate of DOUGLAS G. ROSS,

       Petitioner-Appellee,

v                                       No. 131711

BLUE CARE NETWORK OF MICHIGAN,

       Respondent-Appellant.

_____

KELLY, J. (*dissenting*).

The majority correctly frames the issue. It is "whether the Commissioner of the Office of Financial and Insurance Services (OFIS) is bound by the recommendations of an independent review organization (IRO) on issues of medical necessity and clinical review."[1] But the majority errs by deciding that the commissioner is never bound by such recommendations.

I conclude that the commissioner's review is limited to ensuring that an IRO's recommendations are not contrary to the terms of coverage under the covered person's health-benefit plan.[2] In this case, the IRO's recommendation that respondent Blue Care Network of Michigan be required to pay for services

_____

[1] *Ante* at 1.
[2] MCL 550.1911(15).

provided before November 17, 2002, was consistent with the terms of coverage.

Therefore, I would affirm the well-reasoned decision of the Court of Appeals.

## FACTS

Respondent insured petitioner's decedent, Douglas Ross. In February 2002, Ross began experiencing back and leg pain. By April, he could no longer walk or stand. He was diagnosed as suffering from numerous conditions, the most serious being a severe form of multiple myeloma.[3]

Ross underwent a variety of treatments, including chemotherapy, to combat the disease. In May 2002, he was advised to seek treatment from the Bone Marrow Transplant Clinic at the University of Michigan (U of M). Unfortunately, he was unable to begin treatment at the U of M immediately because his blood-sugar level was elevated.

By early June, Ross's multiple myeloma had become increasingly severe and resulted in tumors in his leg, neck, and eye. Ross was advised by his treating physicians that he had an extremely aggressive strain of the disease. Dr. Lutsic, his radiation oncologist, characterized his condition as the most severe form of the disease he had ever seen. As a result of his deterioration, Ross was told that he was no longer a candidate for a bone-marrow transplant and that the U of M would

---

[3] Multiple myeloma is a cancer of the plasma cell. See Multiple Myeloma Research Foundation, About Myeloma <http://www.multiplemyeloma.org/about_myeloma> (last visited January 7, 2008).

no longer treat him. He was advised that the only remaining course of treatment was medication to handle the pain as he died.

In a final effort to prolong Ross's life, petitioner contacted the University of Arkansas for Medical Sciences (UAMS), a leader in the treatment of myeloma. Dr. Lutsic had told petitioner that he would pursue this option if he were in the same position as Ross. UAMS advised petitioner that it had successfully treated the condition that Ross had, but, if he were to have any chance of survival, he would have to start treatment promptly. Ross immediately requested a referral to UAMS, which was not an in-network provider. Respondent told Ross that it needed time to review UAMS's treatment plan before it took action. However, UAMS stated that it could not provide a treatment plan without first evaluating Ross.

On June 30, 2002, Ross traveled to UAMS for an evaluation. The doctors at UAMS found Ross to be close to death and decided that, without aggressive treatment, he would die very soon. On July 9, 2002, Dr. van Rhee of UAMS provided respondent with an explanation of Ross's condition and the proposed treatment. Dr. van Rhee informed respondent that, without treatment, Ross had only days to live. Ross's certificate of coverage included medically necessary services without prior authorization in cases of immediate and unforeseen medical emergency. This coverage was available until it became medically feasible to transfer the covered person to an in-network provider. Nonetheless, respondent

3

informed UAMS that it intended to deny coverage. And, ultimately, it did refuse to pay for any services provided by UAMS.

The treatment administered at UAMS immediately showed marked success. On July 23, 2002, Ross was discharged. Ross continued outpatient treatment with UAMS, and he was also readmitted on numerous occasions. On December 23, 2002, Ross was admitted to UAMS for the last time. He remained an inpatient until March 2003. He died on April 6, 2003, at 46 years of age.

In regards to Ross's insurance claims, respondent categorized UAMS's services into four periods: (1) outpatient facility services commencing on June 30, 2002, (2) inpatient admission from July 8 through July 23, 2002, (3) inpatient admission on August 1 and 2, 2002, and (4) follow-up testing from September 9 to November 17, 2002. On December 18, 2002, Ross initiated an internal appeal with respondent. When respondent denied the appeal, Ross took the second step in the internal appeal process. Respondent upheld its denial. On April 28, 2003, petitioner filed a request for external review with the Office of Financial and Insurance Services (OFIS)[4] under the Patient's Right to Independent Review Act.[5]

The Commissioner of OFIS[6] accepted the request and assigned the case to Permidion, an independent review organization. The IRO submitted its initial

---

[4] OFIS is now the Office of Financial and Insurance Regulation, effective April 6, 2008. Executive Order No. 2008-2.

[5] MCL 550.1901 *et seq.*

[6] The commissioner in this case was Linda A. Watters.

decision on May 16, 2003. It concluded that Ross's evaluation and admission to UAMS was an emergency and that it would have been inappropriate for Ross to have received care elsewhere. The IRO also concluded that the treatment provided was not experimental or investigational.

The commissioner asked the IRO for clarification in July 2003. She asked the IRO to consider four periods of care: (1) the June 30, 2002, outpatient consultation, (2) the July 8 to July 23, 2002, inpatient admission, (3) the August 1 to August 2, 2002, inpatient admission, and (4) the September 9 to November 17, 2002, follow-up testing. The IRO recognized that the commissioner had specifically asked it to review "whether each of the . . . four episodes meet[s] the criteria for emergency care under the insured's policy, and at what point, if any, would the patient have been stabilized to make it 'medically feasible' to transfer care to an in-network facility."

The IRO determined that it did not have the information required to offer an opinion about the August 1 and 2 treatment. But the IRO concluded that, with respect to the other periods, the treatment was appropriate. The IRO concluded that the initial consultation was emergency care and that it would have been improper to have transferred Ross to another facility because the "patient required ongoing treatment for a period of time under the supervision of his treating physician and it would have been inappropriate for the patient to receive treatment elsewhere." Accordingly, the IRO recommended that respondent's denial be reversed.

5

The commissioner requested even more review in October 2004. The October 2004 request was almost identical to the July 2003 request, and the IRO responded in kind. Specifically, the IRO reiterated its conclusion that the initial treatment constituted emergency services due to lack of a reasonable alternative at an in-network facility. It also again concluded that Ross "required ongoing treatment for his condition at a center that was familiar with his condition under the supervision of his treating physician."

The commissioner made a final request for clarification in January 2005. She asked the IRO to again consider whether Ross had been in an acute medical state in June 2002 and to clarify when Ross had been stabilized for transfer. The IRO responded by noting that Ross was one week away from death when he arrived at UAMS. The IRO also attached its response to the October 2004 request for review, in which it had concluded that it would have been inappropriate to have transferred Ross to another facility. Ultimately, the IRO again recommended that respondent's denial of coverage be overturned for the periods at issue.

On March 30, 2005, nearly two years after petitioner requested external review, the commissioner issued her decision. She disregarded the IRO's conclusions and found that only Ross's July 8 through July 23, 2002, inpatient admission was covered treatment. She decided that this treatment alone constituted emergency care. Accordingly, the commissioner upheld respondent's denial of coverage with respect to the remainder of UAMS's services.

6

Petitioner filed an appeal in the Wayne Circuit Court. The circuit court reversed the commissioner's decision and ordered respondent to pay for all the services rendered by UAMS. The circuit judge reasoned that, because the commissioner had concluded that the July 8 to July 23 hospitalization constituted emergency services, all the services that UAMS provided were emergency services.

Respondent filed an application for leave to appeal in the Court of Appeals. The Court granted leave to appeal and, in a published opinion, affirmed in part and reversed in part the circuit court's order.[7] The Court of Appeals reversed the decision requiring respondent to pay for services rendered after November 17, 2002, because the commissioner had not addressed these services.[8] But the Court affirmed with respect to services provided before November 17, 2002.[9] It held that the commissioner had erred by discounting the IRO's medical recommendations and replacing them with her own independent conclusions.[10]

THE PATIENT'S RIGHT TO INDEPENDENT REVIEW ACT

This case requires us to consider the final decision of an administrative agency and the correct interpretation of a statute. Issues of statutory interpretation

---

[7] *Ross v Blue Care Network of Michigan,* 271 Mich App 358; 722 NW2d 223 (2006).

[8] *Id.* at 381.

[9] *Id.* at 371.

[10] *Id.*

7

are reviewed de novo.[11]  In cases where no hearing is required, final decisions of administrative agencies are reviewed to determine whether the decision was authorized by law.[12]  "[A]n agency's decision that 'is in violation of statute [or constitution], in excess of the statutory authority or jurisdiction of the agency, made upon unlawful procedures resulting in material prejudice, or is arbitrary and capricious,' is a decision that is not authorized by law."[13]

We have been asked to interpret the Patient's Right to Independent Review Act.  Under PRIRA, when an individual believes that a health-care coverage determination is incorrect, he or she has the right to request an independent review.[14]  When the commissioner accepts a request for external review and the review involves questions of medical necessity or clinical review, the commissioner is required to appoint an IRO to assess the services.[15]  The IRO is directed to consider the relevant materials and recommend either upholding or reversing the earlier determination.[16]  Upon receipt of the recommendation, the commissioner is authorized to review the IRO's recommendation "to ensure that it

---

[11] *Ostroth v Warren Regency, GP, LLC*, 474 Mich 36, 40; 709 NW2d 589 (2006).

[12] Const 1963, art 6, § 28.

[13] *Northwestern Nat'l Cas Co v Ins Comm'r*, 231 Mich App 483, 488; 586 NW2d 563 (1998), quoting *Brandon School Dist v Michigan Ed Special Services Ass'n*, 191 Mich App 257, 263; 477 NW2d 138 (1991).

[14] MCL 550.1911(1).

[15] MCL 550.1911(6).

[16] MCL 550.1911(6), (11), and (13).

8

is not contrary to the terms of coverage under the covered person's health benefit plan with the health carrier."[17]

Accordingly, under PRIRA, if a case accepted for external review involves an issue of medical necessity, an IRO must be appointed to make a recommendation. The commissioner, however, has the power to review the IRO's recommendation. But that power is not unlimited. The issue here is whether the commissioner exceeds her power when she substitutes her opinion for the conclusion of the IRO on issues that require the exercise of medical judgment.

For many years, this Court has recognized the maxim *expressio unius est exclusio alterius*.[18] This maxim says that the "express mention in a statute of one thing implies the exclusion of other similar things."[19] So well established is this maxim that it can be assumed that legislators are fully aware the courts will utilize it when construing their words. Accordingly, by expressly giving the commissioner the authority to review the recommendation to "ensure that it is not contrary to the terms of coverage," the Legislature implicitly barred the commissioner from reviewing the recommendation for any other purpose. As explained by the Court of Appeals:

---

[17] MCL 550.1911(15).

[18] E.g., *Peter v Chicago & W M R Co*, 121 Mich 324, 329; 80 NW 295 (1899).

[19] *Bradley v Saranac Community Schools Bd of Ed*, 455 Mich 285, 298; 565 NW2d 650 (1997).

9

[W]hile the Legislature intended that the OFIS Commissioner would review the IRO's recommendation for consistency and compliance with the health plan itself, the Legislature did not intend that the OFIS Commissioner would review or reevaluate the IRO reviewer's specific medical or clinical findings. Instead, the language of PRIRA indicates that the Legislature intended the OFIS Commissioner to defer to the IRO's recommendation on medical issues that do not implicate the language of the health plan itself.[20]

Thus, the commissioner is specifically authorized to review the IRO's recommendation to ensure that it is not contrary to the "terms of coverage." In this respect, the recommendation is not binding. But the commissioner is not allowed to substitute her lay opinion for the medical conclusions of the IRO.[21]

---

[20] *Ross*, 271 Mich App 377-378.

[21] The majority argues that my analysis using *expressio unius est exclusio alterius* leads to an interpretation that is contrary to the language of the statute. The majority claims that I fail to recognize that the commissioner is given the power to uphold or reverse an adverse determination whereas the IRO is not. What the majority overlooks is that the commissioner's power to review the IRO's recommendation is limited to "ensur[ing] that it is not contrary to the terms of coverage . . . ." Thus, the commissioner is authorized to reject the IRO's recommendation only if it is contrary to the terms of coverage. It necessarily follows that the commissioner must adopt the IRO's recommendation when it is not contrary to the terms of coverage. I recognize this point. The majority does not. Hence, it is the majority's interpretation that is contrary to the language of the statute, not mine.

The interpretation of the statute advanced by the members of the majority is another example of their belief that the answer to all questions of statutory interpretation lies in a dictionary. As a result of this belief, they focus on the dictionary definition of the word "recommendation" to resolve the case. But the majority ignores the fact that the commissioner's power of review is limited. Regardless of how the majority defines the word "recommendation," the commissioner exceeds the scope of her power when she performs an act that she is not empowered to do. As I have explained, PRIRA gives the commissioner the power to review the recommendation solely to ensure that it is not contrary to the terms of coverage.

10

Therefore, in order to determine whether the commissioner exceeded the scope of her powers in this case, it is necessary to examine the "terms of coverage."

Here, the IRO's recommendation was consistent with the terms of coverage. Ross's health-benefit plan covered services in cases of immediate and unforeseen medical emergency until such time as it was medically feasible to transfer him to an in-network provider. The IRO concluded that Ross's initial treatment was a medical emergency. It also found that Ross "required ongoing treatment for a period of time under the supervision of his treating physician and it would have been inappropriate for [Ross] to receive treatment elsewhere."

Also, as recognized by the Court of Appeals,

[respondent's] schedule of benefits provides that respondent will provide treatment for "medical emergenc[ies]." The schedule of benefits also provides coverage for related medically necessary services and related ancillary services. The IRO specifically concluded that Ross's initial evaluation from June 30, 2002, until July 7, 2002, and his hospitalization of July 8 to 23, 2002, both constituted emergency services.

Further, as recognized by the OFIS Commissioner in her final opinion and order, Michigan law requires a health maintenance organization certificate, which otherwise provides coverage for emergency health services, to

"provide coverage for medically necessary services provided to an insured for the sudden onset of a medical condition that manifests itself by signs and symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in serious jeopardy to the individual's health[,] . . . serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. An insurer shall not require a physician to transfer a patient before the physician determines that the patient has reached the point of stabilization. An insurer shall not deny payment for emergency health services up to

11

the point of stabilization provided to an insured under this subsection because of either of the following:

"(a) The final diagnosis.

"(b) Prior authorization was not given by the insurer before emergency health services were provided. [MCL 500.3406k(1).]"

MCL 500.3406k(1) goes on to define "stabilization" as "the point at which no material deterioration of a condition is likely, within reasonable medical probability, to result from or occur during transfer of the patient." The IRO reviewer in this case specifically concluded that it would not have been medically feasible to transfer Ross at any time before November 17, 2002, because his condition had not been sufficiently stabilized and because his follow-up treatments at the Arkansas facilities were medically necessary.[22]

In summary, the plan covered medical emergencies up to the point where it was medically feasible to transfer the patient to an in-network facility. Michigan law also requires coverage for emergency health services until stabilization. The IRO determined that (1) the initial treatment was a medical emergency, (2) it was not appropriate to transfer Ross to an in-network facility, and (3) Ross was not stabilized before November 17, 2002.[23] Therefore, the IRO's recommendation

---

[22] *Ross*, 271 Mich App 378-379 (citations omitted).

[23] The majority claims that the IRO never concluded that Ross was not "stabiliz[ed]" as defined by MCL 500.3406k(2). I disagree. In her final request for clarification, the commissioner specifically asked the IRO to consider whether Ross was stabilized as provided in MCL 500.3406k(2). In light of the commissioner's specific request, there is only one reasonable way to read the IRO's conclusion that respondent should be required to pay for the services: Ross was necessarily not "stabiliz[ed]" for transfer as that term is defined by MCL 500.3406k(2).

It seems to me that the majority's problem with the IRO's recommendation can be boiled down to two points. The first lies in the language that the IRO used in its reports. The majority goes so far as accusing the IRO of responding to the

(continued…)

12

that respondent be ordered to pay for the services was consistent with the terms of coverage.[24]  For this reason, the commissioner's decision to ignore the IRO's recommendation was not authorized by law.

Aside from this inconsistency with the statutory language, an additional reason exists for not allowing the commissioner to substitute her opinion for the conclusions of the IRO on issues requiring medical judgment.  The commissioner

---

(…continued)
commissioner's requests with "unresponsive answers."  *Ante* at 24 n 12.  Given that the IRO is made up of doctors, not lawyers, it is not surprising that it did not use the legalistic language that the majority is looking for.  But we have a duty to look beyond the language that is used to understand what the IRO was really saying.  The commissioner repeatedly cited the relevant standards and asked the IRO to reevaluate its conclusion that respondent be required to pay for the services.  Repeatedly, the IRO concluded that respondent should be required to pay for the services at issue.  The commissioner made repeated requests citing the relevant standards and the IRO repeatedly replied that respondent should be required to pay for the services.  Everything considered, the only way to read the IRO's reports is to find that the IRO concluded that the treatment at issue fell within the terms of coverage.

The second point is that the majority apparently believes that the IRO decided that it was going to recommend that respondent be required to "pay for the services *regardless* of whether they fell within the terms of coverage."  *Ante* at 24 n 12.  I find nothing to indicate bias on the part of the IRO.  Accordingly, I find it inappropriate for the majority to make this assumption.  This faulty assumption lies at the heart of the majority's decision.

[24] An example of a recommendation that would be contrary to the terms of coverage would be an IRO's determination that mental-health services were medically necessary when the plan excluded coverage for mental-health services.  In such a situation, the commissioner could reject the recommendation because the plan did not cover mental-health services.

13

is not a physician.[25]  Her expertise is banking.  By contrast, for an IRO to be approved, the IRO and its physicians must meet certain standards designed to ensure quality and credentials.[26]  The commissioner is not a doctor, whereas the IRO is made up of very well-qualified doctors.  I do not see how the commissioner's decision to reject the IRO's medical conclusions in favor of her own uneducated opinion is anything other than arbitrary and capricious.  And a decision that is arbitrary and capricious is not authorized by law.[27]

In this case, the IRO's physician, who is board-certified in internal medicine, medical oncology, and hematology, concluded that Ross's initial evaluation constituted emergency services.  The physician also concluded that it was not appropriate to transfer Ross to another facility before November 17, 2002.  And Ross's condition had not stabilized to the point where he could have been transferred to an in-network facility.  Ross's health plan covered medical emergencies until it was medically feasible to transfer him to an in-network provider.  Michigan law also provides that "[a]n insurer shall not deny payment for emergency health services up to the point of stabilization . . . ."[28]  It follows

---

[25] MCL 500.202 sets forth the qualifications of the commissioner.  Notably absent is any requirement that the commissioner have any medical degree or license.

[26] MCL 550.1919.

[27] *Northwestern Nat'l Cas,* 231 Mich App at 488.

[28] MCL 500.3406k(1).

that respondent was required to pay for the services provided through November 17, 2002.[29]

Yet the commissioner found that only the July 8 to July 23, 2002, services were covered. In so doing, she necessarily rejected the medical findings of the IRO in favor of her own uneducated opinion. Not only was there no medical evidence supporting her decision, she is completely unqualified to offer a medical opinion. There could be no clearer example of an arbitrary and capricious decision.[30]

CONCLUSION

As the Court of Appeals recognized, the commissioner exceeds the scope of her power when she substitutes her opinion for the conclusion of an IRO on issues

---

[29] The majority claims that "the commissioner's determination *was* consistent with the IRO's recommendation to the extent that the recommendation did not contradict the policy provisions or MCL 500.3406k." *Ante* at 22-23. As I have explained, this simply is not true.

[30] The majority takes the position that a conclusion that Ross was not stabilized for transfer is arbitrary and capricious, given that UAMS discharged Ross on July 23, 2002. But the fact that Ross was discharged does not mean that it would have been appropriate to have transferred him to another facility. In fact, in its discharge summary UAMS specifically indicated that Ross required "outpatient followup." The IRO's physician, who is a medical expert, reviewed the relevant materials and reached the medical conclusion that it would have been inappropriate to have transferred Ross to another facility. As the IRO uses physicians medically trained to reach such conclusions, the majority's suggestion that the IRO's conclusion was arbitrary and capricious is preposterous.

In addition, there is no evidence that the services Ross required were offered by an in-network provider. Without proof that an in-network provider offered the requisite services, it is impossible to conclude that transfer would have been appropriate.

that require the exercise of medical judgment.  This result is not only mandated by the statutory language, it is also necessary to avoid allowing the commissioner, a banker, to make medical decisions.  Accordingly, I dissent.  I would affirm the judgment of the Court of Appeals.


Marilyn Kelly


Cavanagh, J.  I would deny leave to appeal.

Michael F. Cavanagh

16